**Shirley OUTLAW, Appellant–Plaintiff,**

v.

**Scott A. DANKS, as Personal Representative of the Estate of Lillian Outlaw, and Stevie D. Tyus, Appellees–Defendants.**

No. 82A01–0503–CV–112.

Court of Appeals of Indiana.

Aug. 17, 2005.

Jack N. VanStone, VanStone & Kornblum, Evansville, for Appellant.

Scott A. Danks, Danks & Danks, Evansville, for Appellees.

## OPINION

BAKER, Judge.

Appellant-plaintiff Shirley Outlaw (Outlaw) appeals the trial court's judgment in favor of appellees-defendants Scott A. Danks, as personal representative of the estate of Lillian Outlaw (Lillian), and Stevie D. Tyus. Specifically, Outlaw contends that the trial court erred in ruling that Tyus had rebutted the presumption of undue influence in the execution of Lillian's Will. Finding that Tyus produced clear and unequivocal proof that rebutted the presumption, we affirm the judgment of the trial court.

### FACTS

Lillian was eighty-four years old when she died on October 15, 2003. In the last months of her life, she suffered from diabetes and blindness. Tyus was Lillian's nephew. In 1997, at the age of forty-four, Tyus was convicted of reckless homicide, and he served three and one-half years at the Indiana Department of Correction. Prior to his incarceration, Tyus had no criminal history, had been employed by General Electric for thirty-seven years, had been honorably discharged from the Army, and had earned a bachelor's degree in Human Resources. He enjoyed a close relationship with Lillian. During his incarceration, Lillian was supportive of Tyus, and they regularly communicated by letter or telephone. Upon being released from prison in March 2001, Tyus asked Lillian if he could live with her, and she agreed.

Eighty-four-year-old Luella Campbell had lived in the basement of Lillian's home since 1993. Campbell lived there rent-free, but she assisted Lillian by cooking for her and cleaning her home. Tyus took over caretaking duties when he moved into Lillian's home. At some point, Tyus locked the door leading from the basement to the main area of the residence so that Campbell could not walk upstairs to visit. Tyus began charging Campbell rent, and she paid $350 per month for the last three months that she lived in Lillian's basement before moving out in the summer of 2003.

On February 9, 2002, Lillian executed a Durable Power of Attorney, designating

Tyus as her agent and attorney in fact. The power of attorney gave Tyus general authority to handle all of Lillian's affairs. Also in February 2002, Tyus closed Lillian's bank accounts, placing her money into his personal accounts and depositing her pension and Social Security checks into his personal accounts. He did so for convenience because he was responsible for taking care of the home.

On July 11, 2003, Tyus and his son Twaka Tyus took Lillian to a Fifth Third Bank in Evansville so that she could execute a "form will" that Tyus had obtained from an Office Depot store and have it notarized. Tyus had prepared the Will by filling in its terms and deciding who would witness it. Office Manager Jamie Roberts and another bank employee, Jennifer Ausbrooks, were present at the signing of the Will. Ausbrooks and Twaka signed the Will as witnesses. No one read the 2003 Will to Lillian prior to her signing it, and Lillian did not say anything while the Will was executed. Lillian was shaky during the time of the execution of the Will, and Tyus assisted her in signing the Will. Tyus was the sole beneficiary of the Will.

Lillian died on October 15, 2003. On November 5, 2003, Outlaw admitted to probate a Will that Lillian had executed on January 30, 1987, naming Outlaw—Lillian's sister-in-law—as the sole beneficiary. On November 13, 2003, Tyus admitted to probate the 2003 Will. Tyus was unaware of the existence of an earlier Will. On January 8, 2004, Outlaw filed a complaint contesting the validity of the 2003 Will, alleging undue execution, unsoundness of mind, and undue influence.

A bench trial was held on September 27, 2004. Both Roberts and Ausbrook testified at the trial that Lillian was thinking clearly and was not confused about the fact that she was signing her Will. Twaka testified that Lillian made reference to the document being her Will while they were at the bank. Twaka also testified that Lillian told him that she wanted her property to go to Tyus. Roy Outlaw, Outlaw's brother, testified that Lillian had told him that she was leaving her property to him and Tyus. On November 18, 2004, the trial court entered its ruling, which included findings of fact and conclusions of law issued sua sponte, finding in favor of Tyus because he had rebutted the presumption of undue influence. Outlaw now appeals.

*DISCUSSION AND DECISION*

Outlaw argues that the trial court erred in finding that Tyus rebutted the presumption of undue influence. Specifically, she asserts that this is clear error because there was no evidence that Lillian knew the contents of the 2003 Will.

As we consider Outlaw's argument, we note that sua sponte findings "control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." *Estate of Skalka v. Skalka,* 751 N.E.2d 769, 771 (Ind.Ct.App.2001).

In a will contest, where the plaintiff establishes that a relationship of confidence and trust existed between the testator and the defendant and the defendant benefitted from the will, a presumption of undue influence arises and shifts the burden of going forward to the dominant party. *Estate of Verdi ex rel. Verdi v. Toland,* 733 N.E.2d 25, 28 (Ind.Ct.App.2000). When a judgment is entered in favor of the dominant party, we review not only the question of whether the judgment is contrary to law, but also whether the dominant party's evidence is sufficient to sustain the judgment that the presumption has been rebutted under the clear and unequivocal proof standard. *Lucas v. Fra-*

*zee,* 471 N.E.2d 1163, 1167 (Ind.Ct.App. 1984). We further note that Indiana Code section 33–42–2–2 provides in pertinent part:

(a) A notary public may not do any of the following:

. . .

(4) Take the acknowledgment of any person who is blind, without first reading the instrument to the blind person.

■■ In order for a will to be valid, the testator, in the presence of two or more attesting witnesses, must signify to the witnesses that the instrument is the testator's will and either sign the will, acknowledge the testator's signature already made, or at the testator's direction and in the testator's presence have someone else sign the testator's name. The attesting witnesses must also sign in the presence of the testator and each other. Ind.Code § 29–1–5–3. When examining a will, the primary purpose is to determine and carry out the intent of the testator. *East v. Estate of East,* 785 N.E.2d 597, 601 (Ind. Ct.App.2003).

■ Outlaw's argument that there is no evidence that Lillian knew of the contents of the 2003 Will inasmuch as she was blind and no one read the Will to her at its execution essentially attacks the requirement that the testator signify to the witnesses that the instrument was her will. We note that the purpose of publication is to ensure that the witnesses are aware that the testator knows he is about to execute a will. *Arnold v. Parry,* 173 Ind. App. 300, 305, 363 N.E.2d 1055, 1058 (1977). A will is sufficiently published where the testator signified it to be her will by the act of signing it after it had been referred to as her will, fulfilling the purpose of the Statute by making the witnesses aware that the testator knew she

was signing her will. *Id.* at 310, 363 N.E.2d at 1061.

■ While it is true that Indiana Code section 33–42–2–2(a)(4) requires a notary to read to a blind person the contents of the document to be notarized, there is no requirement that a will be notarized in order to be valid. *See* I.C. § 29–1–5–3. Thus, Roberts's failure to read the 2003 Will to Lillian does no more than invalidate Roberts's signature as a notary. The Will itself remains valid because all of the requirements under Indiana Code section 29–1–5–3 were present inasmuch as Twaka testified that while at the bank they discussed in Lillian's presence the fact that they were there to execute her Will. Tr. p. 140. And Lillian signed the Will with Tyus's help in the presence of the witnesses. Tr. p. 7. Therefore, the 2003 Will was sufficiently published.

In addition, there is ample evidence that it was Lillian's intent to leave her property to Tyus. Several witnesses testified that Tyus's relationship with Lillian was warm and loving—comparable to a mother-son relationship. Tr. p. 93, 132, 138. And Tyus had been caring for Lillian for two years at the time that the Will was executed. Tr. p. 42, 45, 53–55, 124–25. Thus, he was a natural object of her bounty. On the day that the Will was executed, Lillian specifically made a point of saying that she was leaving everything to Tyus. Tr. p. 142. Roy Outlaw also testified that Lillian told him that she wanted to leave her property to him and Tyus. Tr. p. 126.

While we are concerned about the fact that no one read aloud to a blind woman the contents of her Will before it was executed and notarized, Tyus produced clear and unequivocal proof to rebut the presumption of undue influence. We stress that the better practice in such cases would be to read the Will to the blind person before it is signed, but Tyus

has rebutted the presumption of undue influence in this case.

The judgment of the trial court is affirmed.

RILEY, J., and MATHIAS, J., concur.