James D. CALLAWAY, Jason M. Callaway, and Greg R. Callaway, Appellants,

v.

Hannah CALLAWAY, Truman Callaway, and Debra J. Mathew, Appellees.

No. 28A04–0908–CV–467.

Court of Appeals of Indiana.

Aug. 6, 2010.

John A. Cremer, Cremer & Cremer, Indianapolis, IN, Attorney for Appellants.

Nana Quay–Smith, Phil L. Isenbarger, Karl L. Mulvaney, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE[1]

James Callaway, Jason Callaway, and Greg Callaway ("the Sons") appeal from a jury verdict upholding the validity of the Last Will and Testament of John L. Callaway, ("Will"). The Sons present the following issues for our review:

1. Whether the Will was published in accordance with Indiana Code Section 29–1–5–3.

2. Whether the Will was executed and witnessed in accordance with Indiana Code Section 29–1–5–3.

3. Whether the trial court abused its discretion when it rejected the Sons' proposed Jury Instruction No. 1.

We conclude that the evidence is sufficient to support the jury's verdict that the Will was properly published, executed, and witnessed. We further conclude that the trial court did not abuse its discretion when it refused the Sons' proposed jury instruction on the presumption of undue influence. Thus, we affirm.

### FACTS AND PROCEDURAL HISTORY

From 1995 until his death in June 2008, John lived on a forty-acre farm near Worthington. John was 61 when he died and was survived by three adult sons. Jim, his oldest son, lived in Beech Grove. Jim visited with John on the phone, saw him about five times a year at John's mother's home, met him occasionally to hunt or fish, and drove to the farm each Father's day until 2006. In 2007 Jim first saw John at Thanksgiving. Jason, John's middle son, lived in Terre Haute with his wife and two children. John drove to Terre Haute to visit with Jason's family monthly from 1999 to 2006, but he no longer made the drive in 2007. Jason called John about once a month. Greg, John's youngest son, lived in Terre Haute and later in Pendleton. After moving to Pendleton, Greg saw his father when John drove to Elwood, near Pendleton. Greg spoke with John on the phone once every one or two months, and his last visit to the Worthington farm before 2007 was in 2004.

Shortly after his divorce from Jason and Greg's mother in 1999, John met Debra Mathew. John and Debra both loved horses and became acquainted when John visited her crop and horse-breeding farm in Freedom to inquire about a trail horse she was selling. When Debra was treated for cancer in 2003, John assisted her and, eventually, helped her sell her farm. In

---

1. We held oral argument in this case on May 24, 2010. Also, Hannah Callaway and Truman Callaway are named as parties because they are beneficiaries under the will. Hannah and Truman have not entered an appearance in this court but they are parties to the appeal pursuant to Indiana Appellate Rule 17(A).

2004 Debra bought another farm near John's in Worthington. Although the couple spent much of their time together, they continued to maintain separate residences. The couple's activities included buying, trading, breeding, and riding horses; fishing; breeding dogs; gardening; farming; and visiting family.[2]

On September 27, 2007, John drove one hundred miles to the home of Patricia Ogborn in Noblesville to make a will. Patricia,[3] a notary public, and John had known each other a long time, and she would often see him at horse sale barns. Patricia's daughter, Christeen Ogborn, and her grandson, Jeremy Neel, were at the home when John arrived. Christeen had met John a couple of months earlier at the Strawtown Horse Barn. At Ogborn's home, Patricia and John were sitting together in a room in the home when Christeen entered. Christeen was "asked to be a witness" to a document. Christeen asked if John had signed the document, and he replied affirmatively. Christeen then signed as a witness. Christeen saw Patricia notarize and seal the document. Christeen and John then walked out of the house so she could show him her stud horse.

A short time thereafter, Jeremy, Patricia's grandson, was asked to come in from his chores. Jeremy knew that his grandmother sometimes helped people with their wills. Inside he met John for the first time. When Jeremy asked if the signature on the document was John's, the older man answered affirmatively. Jeremy then signed the document as a witness and left the room.

At Thanksgiving in 2007, Jim visited his father. John had a history of being a heavy drinker. At this visit, he was ailing physically but communicating clearly. Jim asked him to stop drinking, and John attempted to do so "cold turkey" that same day after Jim had left. Transcript at 265. But John suffered hallucinations and blacked out, and Debra called an ambulance. When the medics arrived, John was conscious and refused to go to the hospital. John had told Jim he would undergo treatment for alcohol abuse after the holidays, but he did not do so.

In early 2008, John continued with his chores around his farm for a while, but by March he was too ill to work. More than once Debra asked John to see his physician, and on March 17 she insisted. That day, Debra, with the assistance of friend Nancy Judy, drove John to an appointment with his physician, Dr. Rick Halstead, in Mooresville. Dr. Halstead immediately sent John for admission to Westview Hospital in Indianapolis.

John admitted himself to Westview where his treatment was alcohol detoxification. Debra stayed with him and tended to his non-medical needs. On March 20 she informed the Sons of the hospitalization, and they first visited John on March 23. After John completed treatment at Westview, he was transferred to a nursing home for further rehabilitation. John developed medical complications after a couple of days and was subsequently transferred to Terre Haute Regional Hospital on April 10. There he was diagnosed with alcoholic liver disease.

---

**2.** Debra was also divorced and had grown children.

**3.** First names and titles used in this opinion are to aid the reader's understanding of the facts and issues as many of the parties involved in this matter have the same last names. No disrespect is intended by such use. Additionally, we note discrepancies in the parties' spelling of Christeen Ogborn's first name. We employ the spelling as listed on the Will and the Proof of Will.

While John was an inpatient in Terre Haute, the Sons petitioned for guardianship. After a week in that hospital, John insisted on going home. He was discharged on April 16 and returned home. From John's home, Debra coordinated his hospice and home therapy visits and either stayed with him or arranged for someone to be with him around the clock. John died on June 9, 2008.

On the day John died, Debra spoke with his Bloomfield attorney, Marilyn A. Hartman. Hartman instructed Debra to retrieve the envelope that John had asked Debra to put in his safe immediately before he left for his March 17 doctor's appointment. The envelope contained the Will executed in Noblesville on September 27. At Hartman's request, Debra faxed the Will to Hartman. Hartman then contacted the funeral home director and informed him that John had a will. And the funeral home director informed the Sons that John had a will.

Nevertheless, on June 11, the Sons filed a petition seeking Jim's appointment as the personal representative of John's estate and alleging that John had died intestate. The Sons did not give notice of the petition to Debra. On June 11 Debra filed a petition for probate of the Will, appointment of personal representative, and unsupervised administration of John's estate. Hartman also learned of the Sons' petition, and on June 12 she filed a verified petition for order ex parte, advising the court that John had died testate and that the funeral home director had informed the Sons of that fact before they had filed their petition. As a result, the court vacated the order appointing Jim as administrator of John's estate and revoked his letters of administration. Also in June, Christeen and Jeremy each executed a Proof of Will. On identical Proofs of Will, the affiants swore that John had acknowledged his signature on the Will to Christeen and Jeremy and that Christeen and Jeremy had signed the Will as witnesses in front of John and each other.

On June 26, James filed a Complaint to Resist the Probate of Will. He amended the complaint on November 7 to add Jim and Greg as plaintiffs and Jason's children as defendants due to their beneficial interest under the Will. The Sons amended the complaint a second time on July 3, 2009. The second amended complaint alleged that John had lacked testamentary capacity and that he was subject to Debra's undue influence; that the Will was not executed in accordance with Indiana Code Section 29–1–5–3(b)(2); that Debra breached her fiduciary duty by using John's funds before his death; and that Debra had converted assets.

Shortly before the complaint was set for trial, the court, at Debra's request, bifurcated the issues of John's testamentary capacity, undue influence, and the execution of the Will from the remaining counts. On July 22, Debra filed her answer, affirmative defenses, and counterclaims. On July 23 the Sons filed their trial memorandum on the presumption of undue influence and Debra's burden of production. And on July 27, Debra filed her trial memorandum objecting to the Sons' proffered jury instruction on the presumption of undue influence.

The jury trial on the issues of testamentary capacity, undue influence, and the validity of the Will began on July 28. Christeen, Jeremy, and others testified at trial. Patricia had died in September 2007, well before trial. In an amended trial order dated July 31, following the close of evidence, the court refused to give the Sons' proposed final instruction number 1 on the presumption of undue influence. The Sons timely objected to the court's refusal to give that instruction. Following delibera-

tions, the jury returned a verdict in favor of Debra. The trial court denied the Sons' oral motion for judgment on the evidence under Trial Rule 50.[4] This appeal ensued.[5]

## DISCUSSION AND DECISION

### Standard of Review

The Sons argue in essence that the evidence is insufficient to support the jury's verdict that the will was properly executed. When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind.2003). The evidence will be viewed and all reasonable inferences will be drawn in favor of the verdict. *Id.*

The burden of proof in a will contest is on the opponent of the will. Ind.Code § 29–1–7–20. A party appealing a judgment who carried the burden of proof at trial, and lost, appeals from a negative judgment. *See Khaja v. Khan*, 902 N.E.2d 857, 866 (Ind.Ct.App.2009). A negative judgment is reversible if it is contrary to law. *Fitch v. Maesch*, 690 N.E.2d 350, 352 (Ind.Ct.App.1998), *trans. denied.* When a judgment is attacked as being contrary to law, we may neither reweigh the evidence nor judge the credibility of witnesses. *Stanifer v. Wright*, 806 N.E.2d 311, 313 (Ind.Ct.App.2004). It is only where the evidence and inferences so considered lead to but one conclusion and the trial court has reached a contrary conclusion that the judgment will be disturbed

as being contrary to law. *See id.* (quotation marks and citation omitted). Thus, the Sons carry a heavy burden on appeal.

### Issue One: Publication of the Will

The Sons first contend that John did not publish the will in accordance with Indiana Code Section 29–1–5–3, which sets out the requirements for the execution of a will. The statute provides, in relevant part:

> The testator, in the presence of two (2) or more attesting witnesses, shall signify to the witnesses that the instrument is the testator's will and either:
>
> (A) sign the will;
>
> (B) acknowledge the testator's signature already made; or
>
> (C) at the testator's direction and in the testator's presence have someone else sign the testator's name.

Ind.Code § 29–1–5–3(b)(1). There is no requirement that a will be notarized in order to be valid. *Outlaw v. Danks*, 832 N.E.2d 1108, 1111 (Ind.Ct.App.2005), *trans. denied.*

Publication is the act of making it known in the presence of witnesses that the instrument to be executed is the Last Will and Testament of the Testator. *Arnold v. Parry*, 173 Ind.App. 300, 305, 363 N.E.2d 1055, 1058 (Ind.Ct.App.1977) (citation omitted). The purpose of publication is to ensure that the witnesses are aware that the testator knows he is about to execute a will. *Outlaw*, 832 N.E.2d at 1111. The likelihood of fraud is lessened if

4. In the Amended Trial Order entered August 12, 2009, the trial court denied the Sons' motion for "judgment notwithstanding the jury verdict[.]" Appellants' App. at 110. The motion for judgment notwithstanding the verdict was abolished by Trial Rule 50(E). Thus, the Sons' motion was more properly considered as a motion for judgment on the evidence under Trial Rule 50(A).

5. As discussed in detail below, the Sons appeal the verdict regarding the validity of the Will as well as the trial court's refusal to give a proffered instruction on the presumption of undue influence. The Sons do not appeal the verdict with respect to their claims regarding John's testamentary capacity.

the witnesses know the testator understands the testamentary character of the instrument he is about to execute. *Arnold*, 363 N.E.2d at 1058 (citation omitted). The request for witnesses to sign a will may come from the testator's attorney or scrivener of the will, and is justified as coming from the testator on agency theory. *Id.* at 1059.

Here, the Sons contend that the Will was not properly published because John did not signify to Christeen or Jeremy that the document they were asked to witness was a will. In support of that contention the Sons point to the trial testimony of Christeen and Jeremy. They also argue that the Proofs of Will executed by Christeen and Jeremy were inconsistent with their testimony at trial and, therefore, "are probative of nothing." Appellants' Brief at 23. We cannot agree.

First, Christeen and Jeremy executed the Will under the following attestation clause:

> The following Witnesses jointly and severally certify and attest that in their presence the above and foregoing instrument was signed and acknowledge [sic] by JOHN L. CALLAWAY as his Last Will and Testament, and that we, in his presence and in the presence of each other, at the request of Mr. JOHN L. CALLAWAY, have hereunto subscribed our names as attesting and witnessing this execution of his Last Will and Testament.

Appellants' App. at 32. Christeen later executed under oath a Proof of Will, which provides in relevant part:

1. Affiant is a subscribing witness to the attached instrument dated September 27, 2007, purporting to be the Last Will and Testament of John L. Callaway ("the decedent").

2. Such instrument was on the date thereof duly executed, published, and declared by the decedent to be the Last Will and Testament of such decedent.

3. At such time, the decedent was at least eighteen years old, of sound and disposing mind and memory, under no coercion, compulsion or restrain, and competent to devise his property.

4. *The decedent signified that such instrument was his Last Will and Testament and duly executed the same in the presence of the subscribing witnesses thereto; namely, the affiant and Jeremy Neel.*

5. In the presence of the decedent and in the presence of each other, each of the subscribing witnesses attested and signed the same as witnesses thereto.

Appellants' App. at 268 (emphasis added). And Jeremy executed an identical Proof of Will with the exception that paragraph four listed Christeen as the other witness.

The court instructed the jury on what was necessary under Section 29–1–5–3 for John to publish the Will as follows:

> The law of Indiana requires that the execution of a will must be by the signature of the person making the will and of at least two witnesses as follows:
>
> (1) The person making the will, in the presence of two or more attesting witnesses, shall signify to them that the instrument is the person's will and either:
>
> (i) Sign the will;
>
> (ii) Acknowledge his signature already made; or
>
> (iii) At the person's direction and in the person's presence have someone else sign the person's name.

Appellee's App. at 29.

The Sons contend that the Proofs of Will are entitled to no weight because they

conflict with Christeen's and Jeremy's trial testimony regarding publication of the Will. The Proofs of Will were admitted without objection. And " '[w]e have previously held that where testimony of the attesting witnesses contradicts the substance of the attestation clause from the will, the conflict presents a question of fact for the jury.' " *Fitch*, 690 N.E.2d at 354 (quoting *Munster v. Marcrum*, 182 Ind. App. 20, 393 N.E.2d 256, 258 (Ind.Ct.App. 1979)). "Thus, to the extent there was conflict between the recital of the attestation clause and the testimony of the attesting witness, it was for the factfinder to resolve." *Id.* The same reasoning applies to the Proofs of Will. In other words, the jury was in the best position to weigh the evidence and resolve any conflict or inconsistencies between the trial testimony, the attestation clause, and the Proofs of Will.

The jury verdict in favor of Debra included a determination that John had properly published the Will. Again, we cannot reweigh that evidence or the determine the credibility of Christeen and Jeremy. *Stanifer*, 806 N.E.2d at 313. Instead, we consider only the evidence that supports the verdict and the reasonable inferences to be drawn from the evidence. *Id.* The attestation in the Will and the Proofs of Will are sufficient evidence that John properly published the Will. John's conduct, if not his words, signified to the witnesses that he understood he was making a will, which is the purpose for the publication requirement. *See Outlaw*, 832 N.E.2d at 1111. The Sons have not shown that the evidence is insufficient to show that John published the Will in accordance with Section 29–1–5–3.

### Issue Two: Witnessing the Will

■ The Sons also contend that the Will was not witnessed as required under Section 29–1–5–3. The relevant part of that statute provides that the "attesting witnesses must sign in the presence of the testator and each other." Ind.Code § 29–1–5–3(b)(2). As noted above, by their signatures on the Will Christeen and Jeremy attested that they had executed that document in the presence of John and each other. And Christeen and Jeremy each executed a Proof of Will, in which each stated under oath again that they had signed the Will in the presence of John and each other. The jury was instructed, in relevant part:

> The law of Indiana requires that the execution of a will must be by the signature of the person making the will and of at least two witnesses as follows: ...
>
> (2) The attesting witnesses must sign in the presence of the person making the will and of each other.

Appellee's App. at 29. After being so instructed, the jury rendered a verdict in favor of Debra. The verdict means the jury found that the manner in which the Will was witnessed satisfied the statute.

Still, again, the Sons argue that Christeen's and Jeremy's testimony at trial contradicts their statements on this point in the Proofs of Will. But it was the province of the jury to weigh the evidence. *See Fitch*, 690 N.E.2d at 354. We will not reweigh the evidence on appeal. As such, the Sons' argument that the Will was not properly witnessed must fail.

### Issue Three: Jury Instruction

■ The Sons contend that the trial court abused its discretion when it refused to give their proposed final instruction on the presumption of undue influence. The manner of instructing a jury is left to the sound discretion of the trial court. *Patton v. State*, 837 N.E.2d 576, 579 (Ind.Ct.App. 2005). Its ruling will not be reversed unless the instructional error is such that the charge to the jury misstates the law or otherwise misleads the jury. *Id.* Jury instructions must be considered as a whole

and in reference to each other. *Id.* In reviewing a trial court's decision to give or refuse a tendered instruction, we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Id.* Before a defendant is entitled to a reversal, he must affirmatively show the instructional error prejudiced his substantial rights. *Id.*

This court described the presumption applicable to undue influence claims in *Carlson v. Warren,* 878 N.E.2d 844 (Ind. Ct.App.2007). There we stated:

> Undue influence is "the exercise of sufficient control over [a] person to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *In re Knepper,* 856 N.E.2d 150, 154 (Ind.Ct. App.2006), *reh'g granted on other grounds,* 861 N.E.2d 717 (Ind.Ct.App. 2007), *trans. denied.* It may flow from the abuse of a confidential relationship in which "confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *In re Neu,* 588 N.E.2d 567, 570 (Ind.Ct.App.1992).
>
> Indiana law has long provided that a confidential relationship sufficient to allow for a successful undue influence claim may arise either as a matter of law or can be shown on the particular facts of a case. *Lucas v. Frazee,* 471 N.E.2d 1163, 1166 (Ind.Ct.App.1984). *See also Reiss v. Reiss,* 516 N.E.2d 7, 8 (Ind. 1987). These two types of confidential relationships—"those in which a fiduciary relationship arises by operation of law between the litigating parties, and ... those in which a confidential relationship in fact is shown to exist"—are

treated very differently when we evaluate claims of undue influence or fraud. *Lucas,* 471 N.E.2d at 1166.[1]

*   *   *

Confidential relationships as a matter of law include relationships such as those of "attorney and client, guardian and ward, principal and agent, pastor and parishioner ... [and] parent and child," and we have noted that there may be others. *Supervised Estate of Allender v. Allender,* 833 N.E.2d 529, 533 (Ind.Ct.App.2005) (citation omitted), *reh'g denied, trans. denied.* These relationships "raise a presumption of trust and confidence as to the subordinate party on the one side and a corresponding influence as to the dominant party on the other." *Id.* (emphasis added). This Court has recognized that "when a [confidential relationship as a matter of law] exists and the fiduciary benefits from a questioned transaction, a presumption of undue influence arises and the burden shifts to the fiduciary to rebut the presumption." *In re Knepper,* 856 N.E.2d at 154 (citing *In re Wade,* 768 N.E.2d 957, 961–63 (Ind.Ct.App. 2002), *trans. denied );* see also *Reiss,* 516 N.E.2d at 8. This presumption may be rebutted by "establishing through clear and convincing evidence that [the fiduciary] acted in good faith, did not take advantage of [the] position of trust, and that the transaction was fair and equitable." *Id.* (citing *Villanella v. Godbey,* 632 N.E.2d 786, 790 (Ind.Ct.App. 1994)). On appeal, we review "whether the fiduciary presented sufficient evidence from which the trial court reasonably concluded that the presumption of undue influence was rebutted." *Id.* (citing *Villanella,* 632 N.E.2d at 791).

In the alternative, the facts of a given case may "show a relation of trust and confidence justifying one in relying

thereon," even where there is no legal presumption of such trust. *Middel-kamp v. Hanewich,* 147 Ind.App. 561, 263 N.E.2d 189, 193 (1970) (emphasis added) (quoting *Firebaugh v. Trough,* 57 Ind.App. 421, 107 N.E. 301, 303 (1914)). Instead of creating a rebuttable presumption of undue influence, the burden in such a situation rests with the plaintiff to establish not only the existence of a confidential relationship in fact between the parties but also to prove that "the parties to the questioned transaction did not deal on terms of equality." *Lucas,* 471 N.E.2d at 1167; *see also Reiss,* 516 N.E.2d at 8. The plaintiff "must prove either the dominant party dealt with superior knowledge of the matter derived from a fiduciary relationship, or dealt from a position of overpowering influence as to the subordinate party." *Id.; see also Reiss,* 516 N.E.2d at 8. Only when the plaintiff has shown this and that "the result was an unfair advantage to the dominant party" will the burden of proof shift to the defendant. *Id.; see also Reiss,* 516 N.E.2d at 8. The defendant then has an affirmative duty to show that "no deception was practiced, no undue influence was used, and all was fair, open, voluntary, and well understood." *Id.*

*Carlson,* 878 N.E.2d at 851–52 (some alterations original).

The Sons tendered the following final instruction on the presumption of undue influence where the parties are in a relationship of trust:

> If you find that a relationship of trust and confidence existed between defendant, Debra Mathew, and the decedent, John L. Callaway, and that Debra J. Mathew benefited under the Will, you may assume that the Will is the product

of undue influence, in the absence of clear and convincing evidence that Debra Mathew acted in good faith, did not take advantage of her position of trust, and that the transaction was fair and equitable.

> "The "clear and convincing" standard is an intermediate standard of proof that: lies between a preponderance of the evidence and beyond a reasonable doubt which is required to find guilty [sic] in criminal prosecutions. The burden of proof by clear and convincing evidence is not a burden of convincing you that the facts which are asserted are certainly true or that they are almost certainly true or are true beyond a reasonable doubt. It is, however, greater than a burden of convincing you that the facts are more probably true than not true."

*Villanella v. Godbey,* 632 N.E.2d 786 (Ind.App.1994); *Schultz v. Ford Motor Company,* 85[7] N.E.2d 977 (Ind.2006); *J.C.C. v. State,* 897 N.E.2d 931 (Ind. 2008).

Appellants' App. at 111, 128. The proffered jury instruction correctly states the law on the presumption of undue influence in cases where a confidential relationship exists as a matter of law. Thus, we must consider whether the evidence here supported giving that instruction.

We have found no evidence in the record, nor do the Sons point to any, that John and Debra were in any type of relationship recognized as one of trust and confidence as a matter of law at the time the Will was drafted and executed. *See Carlson,* 878 N.E.2d at 851 (fiduciary relationships include attorney and client, guardian and ward, principal and agent, pastor and parishioner, and parent and child); *Arnold,* 363 N.E.2d at 1062.[6] As

---

**6.** We discuss below the requirement that such a relationship must exist at the time the will is

such, while the proposed instruction might be a correct statement of the law on the presumption of undue influence in a matter of law confidential relationship, the presumption has no application where, as here, the alleged undue influence arises from the facts. Thus, the evidence does not support the proffered instruction, and the trial court properly refused it.

In refusing to give the proposed undue influence instruction, the trial court stated that "the nature of the relationship between Ms. Mathew and [John] was so akin to a spouse-like relationship[,] that that analogy is obvious[,] and based upon that I think that rule of law applies in this particular case." Transcript at 1019. The Sons take issue with the trial court's ruling by asking, "[a]t what factual threshold are unmarried couples exempt from the presumption? Is it to be determined by the length of the relationship, cohabitation, or some other quantum of measurement?" Appellants' Brief at 29. Although we agree with the trial court that the relationship between Debra and John was more analogous to a spousal relationship than to a fiduciary relationship, we agree with the Sons that there is no authority in Indiana for "extending" the rule of law applied in *Womack v. Womack,* 622 N.E.2d 481, 483 (Ind.1993), and *Hamilton v. Hamilton,* 858 N.E.2d 1032, 1037 (Ind.Ct.App.2006), *trans. denied,* to unmarried couples. *See* Appellants' Br. at 29. In those cases, we held that the presumption of undue influence did not apply to transactions between spouses. *Womack,* 622 N.E.2d at 483, *Hamilton,* 858 N.E.2d at 1037. Thus, insofar as the trial court's statements can be read to say that the rule of *Womack* and *Hamilton* applies in this case, the trial court erred.

The Sons' primary contention is that the evidence shows a "dominant and subser-

vient relationship of trust and confidence between [Debra and John] at the time the Will was purportedly signed on September 27, 2007." Appellants' Brief at 32. But Debra and John were unmarried domestic partners. Unmarried domestic partners are not among the relationships of trust and confidence recognized as a matter of law. *See Carlson,* 878 N.E.2d at 851. And while the list of such "at law" relationships is not exhaustive, we are not persuaded that unmarried domestic partners are equivalent to any of the identified relationships that are deemed relationships of trust and confidence as a matter of law.

■ Since a relationship of trust and confidence as a matter of law does not apply here, the question remains whether John and Debra's relationship was one of trust and confidence on the facts of this case. We acknowledge that a "relationship of trust and confidence" on the particular facts of a case has not been succinctly defined. We have held that a "confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Kalwitz v. Estate of Kalwitz,* 822 N.E.2d 274, 281 (Ind.Ct.App. 2005), *trans. denied.* "The question of whether a confidential relationship exists is one of fact to be determined by the finder of fact." *Id.* But the jury instruction that the Sons tendered does not define a "relationship of trust and confidence" even while it asks the jury to determine whether such a relationship existed. To the extent the Sons argue that Debra and John were in a relationship of trust and confidence on the facts of this case, the proposed jury instruction should have defined the term. As such, the instruction was incomplete and potentially confusing for the jury. Further, even if the jury

drafted and executed.

could have found from the facts that Debra and John were in a relationship of trust and confidence, a proper instruction would not have included a presumption of undue influence. *See Carlson*, 878 N.E.2d at 852 (holding that, instead of a presumption of undue influence, a party must prove both a confidential relationship on the facts and that the parties did not deal on equal terms). Thus, again, the trial court did not err when it refused to give the instruction. *See Arnold*, 363 N.E.2d at 1062.

Finally, the Sons take issue with Debra's contention that the presumption of undue influence applies only where the beneficiary was involved in the drafting or execution of the will. In support of that contention, Debra cited *Goodbar v. Lidikey*, 136 Ind. 1, 35 N.E. 691 (1893), and *Willett v. Hall*, 220 Ind. 310, 41 N.E.2d 619 (1942). The Sons attempt to distinguish those cases from the present facts. But whether the cited cases can be distinguished is not controlling. The cited proposition is a correct statement of the law. *See Arnold*, 363 N.E.2d at 1062. Further, that instruction was included in the final instruction given to the jury on undue influence without objection.[7] Thus, the court did not err in giving that instruction.

## Conclusion

John suffered from alcoholism, a chronic disease. But the evidence shows that he had some days that were better than others, that he was not always under the influence, and that when he was sober he could function adequately for short periods of time. In other words, John was not entirely debilitated by his disease but had "good" days and "bad" days. The evidence supports the conclusion that he had testamentary capacity on the day the will was signed. And, later John asked Debra to place the envelope containing the instrument in his safe, a place where wills are often kept.

The trial was well and vigorously contested, and there was evidence before the jury that supports the verdict. The evidence shows that John drove himself alone from Worthington, in Greene County, to Noblesville, in Hamilton County, some 100 miles to meet with Patricia Ogborn, a Notary Public known to prepare wills for others. While meeting with Patricia, with Patricia's assistance John prepared and signed an instrument which on its face purports to be his last will and testament. We are not asked to decide and the record is unclear whether Patricia drafted the Will. And we do not condone the casual manner in which the Will was executed and witnessed in this case. But it is undisputed that the instrument bears John's signature. The precise manner in which the instrument was signed, specifically, whether it was published, executed, and witnessed according to statute, is disputed. The jury was instructed on the law without objection. The evidence supports a conclusion that John's conduct was deliberate, that it was his intent to make a will, and that everyone present knew John's purpose for being there.

The evidence also shows or supports an inference that three persons were present in close proximity to John and each other when John and two witnesses signed the instrument. The Sons describe Patricia Ogborn as an "accidental witness" and con-

---

7. The trial court instructed the jury on undue influence as follows:

Undue influence sufficient to void a will must be of a kind that so overpowers the mind of the person making the will as to destroy the person's free agency and make the person express the will of another. It must be directly connected with the execution of the will and must operate at the time the will was written. It must be of such force that the will is in reality that of another and not that of the person making the will.

Appellee's App. at 34.

tend that her notarization does not count. Appellants' Brief at 24. Debra counters that there is no reason Patricia's signature could not be considered an attestation or to exclude Patricia's signature as that of a witness. Appellee's Brief at 40. But we need not decide whether Patricia's jurat that Christeen and Jeremy "personally came before [her] and being duly sworn [she] did witness the signing of [the Will] in [her] presence as a free and voluntary act for the purposed [sic] stated" made Patricia a statutory witness. Appellants' App. at 32. Whether or not Patricia is deemed a witness, her jurat corroborates the signatures on the instrument and the trial testimony that the testator and two witnesses were present and signed the instrument. Apparently, this evidence considered together with the attestation clause and the Proofs of Will was enough for the jury. The jury was asked to make the ultimate determination whether the instrument was John's will or whether it should be set aside and held for naught, and the jury verdict is not without evidence to support it.

Affirmed.

VAIDIK, J., and BROWN, J., concur.