# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**TRACY A. COLEMAN**
Robert L. Lewis & Associates
Gary, Indiana

ATTORNEY FOR APPELLEE:

**KEVIN W. MARSHALL**
Hobart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

**FILED**

Apr 30 2014, 10:16 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | | |
|---|---|---|
| GARY COMMUNITY SCHOOL CORPORATION, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1306-PL-230 |
| | ) | |
| PRINCE LARDYDELL b/n/f ERMA LARDYDELL, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Calvin D. Hawkins, Judge
Cause No. 45D02-0802-PL-56

**April 30, 2014**

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

## STATEMENT OF THE CASE

Gary Community Schools Corporation ("GCS") appeals the trial court's entry of judgment in favor of Prince Lardydell by his mother and next friend, Erma Lardydell. We affirm.

## ISSUES

GCS raises three issues, which we restate as:

I.      Whether the trial court abused its discretion in admitting evidence.

II.     Whether the trial court abused its discretion in instructing the jury.

III.    Whether the jury's damage award of $120,000 is supported by the evidence.

## FACTS AND PROCEDURAL HISTORY

On May 4, 2006, Prince Lardydell, with aspirations of attending college, was a fifteen-year-old freshman student at West Side High School, which GCS owned, controlled, and operated. At that time, West Side High School had a uniformed police officer, with the power to arrest, patrolling outside the school. Inside, it had uniformed police officers, with the power to arrest, assigned to each of the school's two floors. In addition, the school had seven "supervisory aides," who were authorized to keep order in the school but did not have arrest powers. Tr. p. 346. The inside uniformed officers and aides patrolled the school's hallways. All of the officers and aides had electronic communications equipment. Also, the school had four administrators, one for each grade level, who were available to assist with safety issues. Teachers were responsible for monitoring the hallways outside their classrooms in between classes and had panic or

2

alert buttons to summon safety personnel. Finally, there were seventy-two motion-sensitive video cameras placed throughout the school with a monitoring room.

On the day in question, Prince was in attendance at West Side. He was running late for one of his afternoon classes when several individuals approached him in a hallway. They attacked Prince, knocking him to the floor. Next, they surrounded him and kicked him repeatedly for five to ten minutes as he lay curled up into a fetal position. A teacher in a nearby classroom heard the attack and pressed a panic button. Prince screamed for help, but school safety personnel did not arrive until after the attack had ended and his assailants had left. Prince went to class and finished the school day; however, his mother, Erma, later took him to the emergency room when he complained of headaches.

GCS identified the attackers and expelled two of them from West Side High School. As a result of the attack, Prince had become frightened, and Erma did not allow Prince to attend West Side for the rest of the semester.

Prince was referred to neurologist Dr. Julian Ungar-Sargon, who first saw him on June 5, 2006. Prince complained of headaches, light-headedness, dizziness, problems with concentration, and memory problems. After performing several tests, Dr. Ungar-Sargon diagnosed Prince with a mild concussion. He billed Prince $1186 for two appointments and the tests. *Id.* at 231. Prince's headaches gradually went away over the next eighteen months.

Prince suffered from "a lot of depression" after the attack and hardly left home during the summer following the attack. *Id.* at 276. When Prince told Erma he was

3

considering suicide, the Lardydells became extremely concerned and moved to Indianapolis, leaving the only home Prince had ever known. Prince attended a new high school in Indianapolis, where his grades suffered. After graduating, Prince could only obtain part-time employment. He continued to suffer from mental anguish, continued to be fearful of going outside his home, and had difficulty interacting with and trusting people. Further, he was unable to attend college because of his poor high school grades, which further depressed him.

Prince, by Erma, sued GCS.[1] The case was tried to a jury. Among other witnesses, Prince submitted testimony from Andrea Ledbetter, who had served on GCS's board at the time of the attack. At the close of Prince's case, GCS moved for judgment on the evidence, asserting he had failed to provide evidence of negligence or damages. The court denied GCS's motion. The jury found in favor of Prince, awarding damages of $120,000.

After the jury returned its verdict, GCS orally moved for remittitur, and the court denied the motion. Next, GCS filed a Motion for a New Trial, Remittitur, and/or to Alter or Amend Judgment. The court denied GCS's motion after a hearing. This appeal followed.

---

[1] Prince also sued several other parties, but they were dismissed from the case prior to trial and are not participating in this appeal.

## DISCUSSION AND DECISION

## I. ADMISSION OF EVIDENCE

The decision to admit or exclude evidence rests within the sound discretion of the trial court and will be reversed only upon a manifest abuse of discretion. *Estate of Carter v. Szymczak*, 951 N.E.2d 1, 5 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when the trial court's decision is contrary to the logic and effect of the facts and circumstances before it. *Id.* We will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

GCS asserts the trial court should not have permitted Ledbetter, a former GCS board member, to testify about a video she reviewed in a May 2006 executive session of GCS's board or to describe the topics discussed at an April 2005 GCS executive board session. GCS asserts that the doctrine of qualified privilege applies to all discussions held during its board's executive sessions.

GCS acknowledges that its board is subject to the requirements of Indiana's Open Door Law, which is codified at Indiana Code sections 5-14-1.5-1 through 5-14-1.5-8. The Open Door Law requires that "official action of public agencies be conducted and taken openly, unless otherwise expressly provided by statute, in order that the people may be fully informed." Ind. Code § 5-14-1.5-1 (1987). The provisions of the Open Door Law "are to be liberally construed with the view of carrying out" this policy. *Id.*

GCS, as a public agency, must also acknowledge that pursuant to Indiana law, the primary purpose of Indiana's Open Door policy relating to public agencies is to keep Indiana citizens fully informed of an agency's activities. Specifically, Indiana Code

5

sections 5-14-3-1 through 5-14-3-4 provide an extensive list of exceptions that a public agency may assert as privileged or confidential information, and generally, not available to public disclosure. However, in order to bring itself under the guise of said statutes, there are certain procedures the agency must follow before asserting the privilege. GCS has failed to cite to any authority or point to any evidence in support of its argument that Ledbetter's proposed testimony, about matters that occurred when she served as member of GCS's board, fit within any of the statutory exceptions.

The Open Door Law provides that public agencies, including school boards, may meet in executive session for limited, specified purposes. These purposes include, in relevant part, discussion of strategy with respect to litigation, implementation of security measures, and discussion of alleged misconduct by students. Ind. Code § 5-14-1.5-6.1 (2005). However, the statute is silent as to whether discussions during executive sessions are privileged or whether persons present during an executive session can be barred from disclosing what occurred during an executive session.

A qualified privilege applies to communications made in good faith or on any subject matter in which the party making the communication has an interest or in reference to which he or she had a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty. *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009). The privilege has been applied to claims of negligence. *Brown v. Indianapolis Hous. Agency*, 971 N.E.2d 181, 186 (Ind. Ct. App. 2012).

The doctrine of qualified privilege may provide a defense against a valid tort claim. It does not, however, bar all testimony or shield information from disclosure. To

6

the contrary, the doctrine generally comes into play only after a defendant has transmitted a communication which a plaintiff deems actionable. *See, e.g.*, *Kelly v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007) (defendant raised qualified privilege after plaintiff sued for defamation). GCS does not cite to any authority which has applied the doctrine of qualified privilege, or any other privilege, to bar board members of public agencies from testifying about all discussions during executive sessions.

Ledbetter's testimony was important to Prince's case because she described in detail for the jury a video of the attack that she watched during an executive session. She further testified that the video she saw was not among those that GCS had disclosed to Prince during discovery.

In any event, the trial court ruled that she could testify, but it would not allow Ledbetter to testify about "communications" that occurred during executive sessions. Tr. p. 186. Ledbetter complied with the court's ruling in her testimony. She only described what she saw in the video as noted above, and she testified that she attended an April 2005 executive board session wherein school security was one of the topics on the agenda for discussion. She did not testify about any communications, litigation strategies, or any other matters that occurred during the executive sessions she attended. We cannot conclude that the court abused its discretion by allowing Ledbetter to testify in compliance with the limitations it imposed.[2]

---

[2] GCS argues in its reply brief that the trial court also erred by admitting Plaintiff's Exhibit 2, a transcript of Prince's grades, into evidence. Claims raised for the first time in a reply brief are waived. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005).

## II. JURY INSTRUCTIONS

When reviewing a trial court's decision to give or refuse a tendered instruction, we consider whether the instruction (1) correctly states the law, (2) is supported by evidence in the trial record, and (3) is covered in substance by other instructions. *Star Transp., Inc. v. Byard*, 891 N.E.2d 1099, 1102 (Ind. Ct. App. 2008), *trans. denied*. The trial court has discretion in instructing the jury and will be reversed on the last two points only when the instructions amount to an abuse of discretion. *Id.* Whether an instruction correctly states the law, however, is a question of law that we review de novo. *Id.*

### A. Final Instruction 12

GCS challenges the trial court's revised Final Instruction 12, claiming it misstates the law. As given to the jury, that instruction provides:

> There are certain situations in which the nature of an incident and the circumstances surrounding it lead to the reasonable belief that it would not have occurred unless someone did not use reasonable care.
>
> If Prince Lardydell proves all of the following by the greater weight of the evidence:
>
> > (1) Prince Lardydell was injured when he was attacked and beaten in a hallway at Westside High School within the Gary Community School Corporation;
> >
> > (2) Gary Community School Corporation controlled the conditions of the school hallways where the attack took place;
>
> then you may infer that the incident resulted from Gary School Corporation's negligence. You may consider this inference with all of the other evidence in arriving at your verdict.

Appellant's App. p. 38.

8

Final Instruction 12 was based on Prince's proposed Tendered Instruction 1, which provided:

> There are certain situations in which the nature of an incident and the circumstances surrounding it lead to the reasonable belief that it would not have occurred unless someone did not use reasonable care.
>
> If Prince Lardydell proves all of the following by the greater weight of the evidence:
>
> > (1) Prince Lardydell was injured when he was attacked and beaten in a hallway at Westside High School within the Gary Community School Corporation;
> >
> > (2) Gary Community School Corporation controlled the conditions of the school hallways where the attack took place;
> >
> > (3) under normal circumstances, Prince Lardydell would not have been attacked and injured unless Gary Community School Corporation was negligent;
>
> then you may infer that the incident resulted from Gary School Corporation's negligence. You may consider this inference with all of the other evidence in arriving at your verdict.

*Id.* at 18. During the jury instruction conference, GCS objected to Prince's Tendered Instruction 1 as follows:

> And our objection would be that's a misstatement of the law. [Prince is] adding an extra duty to the School Corporation that does not exist. The duty is reasonable care. Not only is it a misstatement of the law, it will confuse the jurors regarding the actual duty, which is on the School Corporation, and that's reasonable care. It's not foreseeability [sic] that because somebody was attacked we did something wrong.

Tr. p. 393. The court excised subsection 3 from the instruction in response to GCS's objection.

The parties are in agreement that Final Instruction 12 purported to instruct the jury on the doctrine of res ipsa loquitur. Res ipsa loquitur is translated from Latin as "the thing speaks for itself." *Gold v. Ishak*, 720 N.E.2d 1175, 1180 (Ind. Ct. App. 1999), *trans. denied*. It is a rule of evidence that permits an assumption that in some situations an occurrence is so unusual that, absent a reasonable justification or explanation, the person in control of the situation should be held responsible. *Hale v. SS Liquors, Inc.*, 956 N.E.2d 1189, 1194 (Ind. Ct. App. 2011). If the doctrine's elements are met, it allows a permissive inference of negligence. *Id.* A plaintiff must establish (1) the circumstances under which the injury occurred were under the management or exclusive control of the defendant, and (2) the occurrence is one which in the ordinary course of business does not happen if those who control the circumstances use proper care. *Gold*, 720 N.E.2d at 1181 (quoting *Vogler v. Dominguez*, 624 N.E.2d 56, 61 (Ind. Ct. App. 1993), *trans. denied*), *trans. denied*.

GCS claims the trial court erred in giving Final Instruction 12 because it misstates the law and allowed the jury to determine that GCS was negligent without first deciding whether GCS breached the standard of ordinary and reasonable care. GCS cites *LaPorte Community School Corp. v. Rosales*, 963 N.E.2d 520 (Ind. 2012), in support of its claim. In that case, a parent sued a school corporation after her child died at school from choking on food. The parent prevailed at a jury trial, and the school appealed. Specifically, the school argued that Final Instruction 22 was erroneous because it allowed the jury to hold it liable without also finding that it acted negligently, meaning that it breached the standard of ordinary and reasonable care. That instruction provided that

10

Rosales had the burden of proving the school corporation "was negligent in any of the following ways" and listed a number of omissions the school corporation may have committed in relation to the student's death. *Id.* at 523.

Our Supreme Court noted that the challenged instruction was "akin to a comprehensive instruction enumerating the elements of the cause of action on which the plaintiff must sustain her burden of proof in order to prevail." *Id.* Such instructions, the Court noted, are "particularly vital to a jury's ability to understand and apply the law to the facts in each particular case." *Id.* at 524. The Court reasoned that the instruction was erroneous as a matter of law because it identified factual circumstances that, if proven, "automatically constitute[d]" negligence without consideration of whether the school corporation had breached a duty. *Id.* The instruction thus "substantially misstated the plaintiff's burden of proof." *Id.* at 525. The Court further ruled that the erroneous instruction was not saved by another jury instruction defining negligence because, when read together, Final Instruction 22 remained ambiguous and the error was not corrected by the remaining portions of the jury charge.

Res ipsa loquitur was not at issue in *Rosales*, so that case is not controlling here. Furthermore, Final Instruction 12 is quite different from the erroneous instruction at issue in *Rosales*. The instruction in *Rosales* may have misled the jury into concluding that if Rosales had proven that the school had failed to act in a specific manner, it could find negligence without considering whether the school had breached a duty. By contrast, Final Instruction 12 merely provided that if the Lardydells proved certain facts "beyond the weight of the evidence," then the jury "may infer" negligence. Appellant's App. p.

18. The jury was not obligated by the terms of the instruction to find negligence, and GCS was free to submit evidence to rebut any inference of negligence. *Rosales* is thus distinguishable.

Furthermore, the instructions in this case, when read together, sufficiently defined negligence. We consider jury instructions as a whole and in reference to each other. *Callaway v. Callaway*, 932 N.E.2d 215, 222-23 (Ind. Ct. App. 2010). An improper instruction will merit reversal only if it so affects the entire charge that the jury is misled as to the law in the case. *Upham v. Morgan Cnty. Hosp.*, 986 N.E.2d 834, 837-38 (Ind. Ct. App. 2013), *trans. denied*.

Here, the court instructed the jury to consider all of the instructions together, without singling out any one instruction. Appellant's App. p. 28. In Final Instruction 7, the court defined negligence as follows:

> Negligence is the failure to use reasonable care.
>
> A person may be negligent by acting or by failing to act. A person is negligent if he or she does something a reasonably careful person would not do in the same situation, or fails to do something a reasonably careful person would do in the same situation.

*Id.* at 33. In Final Instruction 9, the court further instructed the jury, "The appropriate standard is whether the Gary Community School Corporation, by its personnel, exercised their [sic] duty with the level of care that an ordinary prudent person would exercise under the same or similar circumstances." *Id.* at 35.

Unlike in *Rosales*, Final Instruction 12 here was not a comprehensive instruction intended to supplant other instructions defining negligence. In addition, the other

12

instructions clearly established that in order to prove negligence, the Lardydells were required to prove that GCS had a duty to Prince and did not fulfill its duty with a reasonable level of care. Viewing the instructions as a whole, we conclude the instructions adequately informed the jury as to the elements of negligence and did not confuse or mislead them to misapply the law.

Next, GCS claims the court should not have instructed the jury on res ipsa loquitur. "When presented with a request for a res ipsa loquitur instruction, the trial court's duty is to determine whether the plaintiff produced evidence from which the jury could reasonably conclude the existence of the underlying elements of exclusive control and probability of negligence." *Sharp v. LaBrec, Inc.*, 642 N.E.2d 990, 993 (Ind. Ct. App. 1994), *trans. denied*. Having reviewed the record, particularly evidence of the extensive security measures GCS implemented at West Side High School to keep out intruders and monitor the hallways, we conclude there was sufficient evidence to warrant the giving of the instruction. We find no abuse of discretion.

## B. Final Instruction 15

GCS claims there was no evidence to support the giving of Final Instruction 15. That instruction provided:

> If you decide from the greater weight of the evidence that School City of Gary [sic] is liable to Prince Lardydell, then you must decide the amount of money that will fairly compensate Prince Lardydell.
>
> In deciding the amount of money to award, you may consider:
>
> (1) the nature and extent of the injury, and the effect of the injury on Prince Lardydell's ability to function as a whole person;

13

(2) whether the injury is temporary or permanent;

(3) the physical pain and mental suffering Prince Lardydell has experienced and will experience in the future as a result of the injury;

(4) the reasonable value of necessary medical care, treatment, and education services plaintiff incurred.

*Id.* at 41.

The quantum of evidence necessary for the giving of an instruction is deliberately set at a relatively low level in order to assure the right of parties to have the trier of fact determine factual disputes and to preserve the constitutional right to trial by jury. *Upham*, 986 N.E.2d at 838. Here, Prince presented testimony by Dr. Julian Ungar-Sargon that he sustained a mild concussion as a result of the attack and incurred costs for office visits and tests. There was also testimony that Prince's mother took him to the emergency room on the date of the attack. In addition, Prince testified that he experienced sporadic headaches for eighteen months as well as long-lasting symptoms of mental anguish and depression caused by the attack. This was sufficient evidence of damages to support the giving of the instruction.

## III. DAMAGES

GCS contends the trial court should have granted its Motion for a New Trial, Remittitur, and/or to Alter or Amend Judgment because the jury's award of $120,000 is unsupported by the evidence.

A jury's determination of damages is entitled to great deference when challenged on appeal. *Raess v. Doescher*, 883 N.E.2d 790, 795 (Ind. 2008). A damage award will not be reversed if it falls within the bounds of the evidence. *Id.* We look only to the

14

evidence and inferences therefrom which support the jury's verdict and will affirm if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting. *Id.*

Damage awards for pain, suffering, fright, humiliation, and mental anguish are particularly within the province of the jury because they may not be reduced to fixed rules and mathematical precision. *Ritter v. Stanton*, 745 N.E.2d 828, 845 (Ind. Ct. App. 2001), *trans. denied*. Those categories of damages inevitably involve the weighing of evidence and credibility of witnesses. *Id.* Thus, where damages cannot be calculated with mathematical certainty, the jury has liberal discretion in assessing damages. *Id.*

The trial court instructed the jury that it could consider the nature, extent, and duration of Prince's injuries, as well as his ability to function as a whole person, in assessing damages. The jury was also told to consider Prince's past and future physical pain and mental suffering resulting from the attack. Finally, the trial court instructed the jury to review the costs of mental care and treatment Prince incurred.

Prince's medical bills were comparatively small, totaling no more than a few thousand dollars. However, Dr. Ungar-Sargon diagnosed Prince with a mild concussion, and he experienced sporadic headaches extending over a period of eighteen months after the attack.

Next, we turn to mental pain and suffering. Before the attack, Prince investigated colleges by going on tours and looking at applications. He had also looked into taking aviation or dental courses after high school. Prince made "Cs and Bs" during his

15

freshman year at West Side and had a GPA of 2.59. Tr. pp. 271, 275. In addition, he and his mother had saved up several thousand dollars to pay for college.

After the attack, Prince experienced mental anguish and, at times, severe depression. He stayed inside his house almost the entire summer after the attack and did not talk much to his family or friends. Prince was afraid to go outside. The family moved to Indianapolis and enrolled Prince in a new school after he told Erma he was contemplating suicide. *Id.* at 338. It "weighed real heavy on him" to leave the only home he had ever known and move to Indianapolis. *Id.* at 280. When break-ins occurred in the family's former home in Gary, and Erma was required to go address the events, Prince "blamed himself" for the family's move and financial problems. *Id.* at 281.

Prince's academic performance suffered at his new high school in Indianapolis. He graduated, but his overall grade point average dropped to 1.76, and his class ranking was 699 out of 817. He missed school eighteen times during his sophomore year. Prince testified he was distracted a lot and "lost a lot of motivation" because he "was just looking over [his] back a lot of times." *Id.* at 309. He did not go on any more college tours because he was afraid. Prince applied to several colleges but was rejected due to his low grades.

After graduating from high school, Prince was only able to obtain several part-time jobs and continued to experience mental anguish and depression. Prince testified that even six years after the attack, he did not trust anyone, "not even people I've been cool with for years." *Id.* at 308. He also tended to stay home when not working because "you just never know what can happen outside." *Id.*

16

This evidence would permit a reasonable jury to conclude that Prince suffered severe, long-lasting mental trauma as a result of the attack which severely limited his ability to function as a whole person. The attack caused him to experience depression to the point of contemplating suicide, which led to his family having to move from their home and leave town so that he could attend a new school. In addition, mental pain and suffering detrimentally affected Prince's high school studies to the point that it all but destroyed his college prospects. Furthermore, he still experiences fear to the point that it hinders his personal relationships and his freedom of movement.

We find this evidence is sufficient to sustain the jury's award of $120,000 despite Prince's comparatively small medical bills. *See Weinberger v. Boyer*, 956 N.E.2d 1095, 1113 (Ind. Ct. App. 2011) (affirming $292,000 damage award for future medical expenses and emotional pain and suffering although plaintiff's tangible medical bills were only $8,000), *trans. denied*; *Landis v. Landis*, 664 N.E.2d 754, 757-58 (Ind. Ct. App. 1996) (affirming damage award of $537,200 for emotional pain and suffering where defendant attacked plaintiff, physically forced her from her place of employment, and deprived her of income), *trans. denied*; *Planned Parenthood of Nw. Ind., Inc. v. Vines*, 543 N.E.2d 654, 662 (Ind. Ct. App. 1989) (affirming damage awards that "were almost exactly tenfold" plaintiffs' demonstrated special damages because plaintiffs proved "intangible damages" including pain and suffering), *trans. denied*.

GCS notes that Prince never sought treatment from a mental health professional for his depression. GCS also states that Dr. Ungar-Sargon referred Prince to a Dr. Coyle for psychological testing in 2006, and the testing showed no problems. At best, GCS

17

requests that we conduct a comparative analysis of the evidence because their evidence conflicts with Prince and Erma's testimony and evidence as heard by the jury. However, we find that GCS's evidence does not require us to second-guess the jury's decision.

CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.