# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**JEREMY A. PEELLE**
Peelle Law Office
Kokomo, Indiana

ATTORNEY FOR APPELLEE:

**DAN J. MAY**
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| EUNICE MCKIBBEN, | ) | |
| | ) | |
| Appellant/Defendant, | ) | |
| | ) | |
| vs. | ) | No. 34A02-1311-PL-988 |
| | ) | |
| JEFF HUGHES, b/n/f JOYCE HUGHES, | ) | |
| | ) | |
| Appellee/Plaintiff. | ) | |

APPEAL FROM THE HOWARD SUPERIOR COURT
The Honorable George Hopkins, Judge
Cause No. 34D04-1204-PL-376

**December 19, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

Appellant/Defendant, Eunice McKibben ("McKibben"), appeals the trial court's judgment requiring McKibben to reimburse Appellee/Plaintiff, Jeff Hughes ("Hughes") $14,879.55 for funds she spent repairing a property he had conveyed to her ("the Property") and for checks she wrote from their joint checking account. She argues that there was no evidence that she paid for the repairs with Hughes' funds or that she withdrew the checks for her benefit. She claims that she wrote the checks to satisfy bills for the Property that he was required to pay as her tenant.

Hughes cross-appeals, challenging the trial court's denial of his request to rescind the deed for the Property he conveyed to McKibben. He argues that McKibben committed constructive fraud because they had a confidential or fiduciary relationship, and he relied on her misstatements when he transferred the property to her. Alternatively, he argues that McKibben was unjustly enriched by his conveyance and that he was incompetent to convey the deed.

With respect to McKibben's appeal, we conclude that she is liable for the checks she wrote on their joint banking account because the funds in the account belonged to Hughes. Also, the checks she wrote were for rent and bill payments for the Property, which she owned, and she and Hughes did not have a landlord-tenant relationship. We also determine that the trial court did not err in finding that McKibben paid for the repairs to the Property with Hughes' funds. However, we find that the trial court miscalculated the judgment against McKibben, so we reverse and remand to the trial court with instructions for the court to re-enter judgment against McKibben in the amount of

2

$15,679.55. With respect to Hughes' cross-appeal, we conclude that the trial court's denial of Hughes' request to rescind the deed was not erroneous.

We affirm in part, reverse in part, and remand.

## ISSUES

**APPEAL**

1. Whether the trial court erred in entering judgment against McKibben in the amount of $14,879.55.

**CROSS-APPEAL**

2. Whether the trial court erred in denying Hughes' request to rescind the deed he conveyed to McKibben.

## FACTS

McKibben and Hughes met in 1991. Over the following years, they were at times romantically involved and, at other times, were only friends and fishing buddies. In 2008, Hughes lived with McKibben for two weeks. Otherwise, Hughes lived primarily with his father in his father's house—which was on the Property—from 2003 or 2004 until his father's death in 2009. When his father died, Hughes inherited the Property.

In the meantime, on September 25, 2009, officers from the Kokomo Police Department committed Hughes involuntarily to a mental health facility. Hughes stayed at the mental health facility for around three weeks, during which time he underwent treatment for bipolar disorder and depression. He hired a lawyer, David Rosselot ("Rosselot"), who had been McKibben's friend for around twenty years, to challenge his involuntary commitment. With Rosselot's assistance, the facility released Hughes on October 16, 2009. After his release, Hughes continued treatment. He also continued to

3

take Abilify, a medicine that the facility had prescribed him, for approximately two and a half years. He testified that this medicine "did all kinds of things to [him]" to the point that he could not walk, was confused, had poor judgment, was suicidal, and was in "bad pain." (Tr. 64).

After Hughes was committed, the City of Kokomo barred anyone from entering the Property due to its condition. Upon Hughes' release from the facility, he moved in with McKibben and lived there until their relationship ended in December 2011. During that time, he hired Rosselot again to help him regain possession of the Property, which he achieved by court order on January 13, 2010. When he regained possession of the residence, Hughes and McKibben went to the Property, and Hughes retrieved $17,800 that he had hidden in the house. He gave the cash to McKibben for safekeeping.

In March or April of 2010, McKibben helped Hughes qualify for Social Security benefits. She opened a bank account for him at Solidarity Community Federal Credit Union so that his Social Security benefit payments could be directly deposited there. With Hughes' consent, the bank account was a joint account that also had McKibbens' name on it. Throughout the time the account was open, McKibben never deposited any of her own money into it, although both she and Hughes made withdrawals.[1] Eventually, she removed her name from the account on December 27, 2011.

---

[1] Neither of the parties dispute that, even though the account was a joint account, the funds in the account belonged to Hughes under Indiana law. I.C. § 32-17-11-17 ("Unless there is clear and convincing evidence of a different intent, during the lifetime of all parties, a joint account belongs to the parties in proportion to the net contributions by each party to the sums on deposit."). Accordingly, we will refer to the joint account as Hughes' account.

4

On April 19, 2010, McKibben drove Hughes to see Rosselot. With Rosselot's assistance, Hughes deeded the Property to McKibben through a quitclaim deed and executed a will leaving all of his property to her. In exchange for the Property, McKibben gave Hughes one dollar. Hughes later estimated that the house was worth forty or forty-five thousand dollars.

After Hughes conveyed the Property to McKibben, she made repairs to the house on the Property ("the Residence"), although neither Hughes nor McKibben lived there. In September of 2010, she replaced the windows of the Residence, and in September of 2012 she replaced its roof. In total, she spent $8,200.

Between April 19, 2010, when Hughes conveyed the Property to McKibben, and December 27, 2011, when McKibben withdrew her name from their joint Solidarity bank account, both McKibben and Hughes wrote checks from the account to pay for the Property's bills. Fourteen checks were addressed to McKibben that purported to pay McKibben "rent" for the Property. Each "rent" check was made out for $400, and all of the rent checks combined totaled $5,600.[2] Hughes signed eleven of the rent checks, and McKibben signed three.

In addition, McKibben signed a variety of checks withdrawing money from the account to pay for the residence's bills. These checks included $525.27 to Duke Energy; $289.31 to City of Kokomo Wastewater Utility; $505.29 to Kokomo Gas and NIPSCO, both natural gas providers; $21.92 to Indiana American Water; and $627.76 to Indiana

---

[2] In its findings, the trial court found that the rent checks made out to McKibben totaled $4,800. In our review of the record, we found a total of fourteen rent checks, each made out for $400. The actual amount of rent checks, therefore, totals $5,600 rather than the $4,800 the trial court found.

5

Farm Bureau. These amounts, combined with the checks for rent, totaled $7,569.55.[3] In addition, either Hughes or McKibben drew several electronic checks on Hughes' account, including $379.33 in transfers to American Water and a $400 transfer to McKibben's account.[4] Starting in 2010, McKibben also paid approximately $800 per year in property taxes for the Property from her own money.

On May 13, 2013, Hughes and his mother, who had been appointed his power of attorney, filed an amended complaint against McKibben, alleging that she had procured the deed to the Property by fraud. In his complaint, Hughes requested, among other relief, reimbursement for all of the money McKibben had withdrawn from his Social Security funds and rescission of the deed to the Property.[5] He claimed that, pursuant to INDIANA CODE § 32-17-11-17, the funds in his joint bank account with McKibben belonged solely to him and that she did not have a right to withdraw money from his account for her benefit.

The trial court held a bench trial on August 5 and 23, 2013. During the trial, the parties highly disputed the facts of the case. Hughes testified that McKibben had told him to transfer the deed to her because if he did not, Medicaid would take his house away from him. He also testified that McKibben had used part of the $17,800 cash he had given her for safekeeping to pay for the repairs to the Residence. According to Hughes,

---

[3] The trial court found that the checks totaled $6,769.55. Because we have found that additional rent checks were drawn from Hughes' account, our total differs from that of the trial court.

[4] The trial court did not include these electronic transfers in its judgment.

[5] Hughes also requested the return of his personal property, which McKibben possessed, and the return of the will that Rosselot had prepared. Neither of these requests is at issue on appeal.

she spent part of the remainder of the $17,800 on a truck, which he thought she had then sold to her son.

Later in the trial, Rosselot testified that he remembered that the reason for Hughes' conveyance of the Property was "Medicaid planning." (Tr. 117). He also stated that he had not been concerned about Hughes' competency to execute the will and the deed. He said that if he "had had concerns that [Hughes] didn't know what he was doing, [he] wouldn't have prepared [the deed]." (Tr. 112).

Lastly, McKibben testified. She denied ever discussing Medicaid with Hughes and claimed that Medicaid was not the reason Hughes had conveyed the deed to her. She also testified that she had paid for the repairs to the Residence by selling her truck to her daughter. She did not clarify whether the truck she sold was the same truck that, according to Hughes, she had bought with his money.

At the conclusion of the trial, the trial court took the matter under advisement, and on September 5, 2013, it issued its ruling. It denied Hughes' request to rescind the deed for the Property, finding that Hughes had failed to establish that McKibben owed him a fiduciary duty and, as a result, had acted fraudulently. However, the trial court found that McKibben had improperly withdrawn funds from Hughes' bank account as a result of the checks she wrote for the Property's bills and was liable to Hughes for $6,679.55. The trial court also found that McKibben had paid for the repairs to the Residence with Hughes' funds and was therefore liable to him for the $8,200 she used to pay for the repairs. In total, the trial court entered judgment against McKibben in the amount of

7

$14,879.55, along with the costs of the action. McKibben now appeals and Hughes cross-appeals. Additional facts will be provided as necessary.

## DECISION

On appeal, McKibben challenges the trial court's judgment against her in the amount of $14,879.55. She argues that there was no clear evidence that she utilized any of Hughes' bank funds for her personal benefit. Instead, she claims that she withdrew money from his account to pay for expenses related to Hughes' use of the Property to store his belongings and that she was entitled to do so because she was his landlord. In addition, she claims that there was no evidence to refute her testimony that she used her own funds to pay for the repairs. She notes that the amount used for the repairs was not withdrawn from Hughes' bank account.

On cross-appeal, Hughes disputes the trial court's denial of his request to rescind the deed. He argues that the trial court should have found that he and McKibben had a confidential or fiduciary relationship and that the conveyance of the deed was therefore constructively fraudulent. Alternatively, he argues that he is entitled to imposition of a constructive trust over the Property and to have the deed set aside under a theory of either (1) unjust enrichment in a cohabitation relationship; or (2) incompetence to execute the deed to McKibben as a result of his mental illness.

Where, as here, the trial court has entered findings of fact and conclusions thereon *sua sponte*, the findings only control as to the issues they cover. *Barkwill v. Cornelia H. Barkwill Revocable Trust*, 902 N.E.2d 836, 839 (Ind. Ct. App. 2009), *trans. denied.* We will not set aside its findings and conclusions unless they are clearly erroneous.

8

*American Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 246 (Ind. Ct. App. 2010), *reh'g denied*. On appeal from an adverse judgment, the findings are clearly erroneous if they are not supported by substantial evidence of probative value. *Id.* In determining whether the findings and judgment are clearly erroneous, we will neither weigh the evidence nor judge witness credibility. *Foster v. Bd. of Comm'rs of Warrick Cnty., Ind.*, 647 N.E.2d 1147, 1148 (Ind. Ct. App. 1995), *reh'g denied*, *trans. denied.*

Although we would normally address arguments on an appeal before arguments on a cross-appeal, our assessment of McKibben's claims is partly dependent on whether Hughes' conveyance of the deed to the Property to her was lawful. Accordingly, we will address Hughes' cross-appeal before we turn to McKibben's appeal.

CROSS-APPEAL

As stated above, Hughes argues that the trial court erred in denying his request to rescind the deed. He argues that the court should have granted his request on one of three grounds: (1) constructive fraud; (2) unjust enrichment; or (3) incompetence to convey the Property. We will address each of these grounds in turn.

1. Constructive Fraud

First, we will address Hughes' claim that the trial court erred in denying his request for rescission of the deed because he and McKibben had a confidential or fiduciary relationship, and, therefore, his conveyance of the Property was constructively fraudulent.

Constructive fraud "'arises by operation of law from a course of conduct which, if sanctioned by law, would []secure an unconscionable advantage, irrespective of the

9

existence or evidence of actual intent to defraud.'" *Kalwitz v. Estate of Kalwitz*, 822

N.E.2d 274, 280 (Ind. Ct. App. 2005) (quoting *Paramo v. Edwards*, 563 N.E.2d 595, 598

(Ind. 1990)), *trans. denied.* It is based on the premise that "'there are situations which

might not amount to actual fraud, but which are []so likely to result in injustice that the

law will find a fraud despite the absence of fraudulent intent.'" *Id.* (quoting *Stoll v.

Grimm*, 681 N.E.2d 749, 757 (Ind. Ct. App. 1997)). The elements of constructive fraud

are: (1) a duty by virtue of the existing relationship between the parties; (2)

representations or omissions made in violation of that duty; (3) reliance thereon by the

complaining party; (4) injury to the complaining party as a proximate result thereof; and

(5) the gaining of an advantage by the party to be charged at the expense of the

complaining party. *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994), *reh'g

denied, trans. denied*.

Here, the trial court found that McKibben did not owe Hughes a fiduciary duty.

As a result, the trial court did not address the remaining elements of constructive fraud

before denying Hughes' request for rescission of the deed. Similarly, the parties focus on

the issue of whether or not McKibben owed Hughes a duty. Accordingly, we will

address the issue of duty, although we ultimately find the second element of constructive

fraud dispositive.

A. *Duty*

The first element of constructive fraud is that there must be a duty by virtue of the

existing relationship between the parties. *Id.* Specifically, the existing relationship

between the parties must be confidential or fiduciary in nature. *Kalwitz*, 822 N.E.2d at

10

280 (stating that "[c]onstructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential *or* fiduciary relationship") (emphasis added). Indiana recognizes two types of confidential relationships—"those in which a fiduciary relationship arises by operation of law between the litigating parties, and . . . those in which a confidential relationship in fact is shown to exist."[6] *Callaway v. Callaway*, 932 N.E.2d 215, 223 (Ind. Ct. App. 2010) (quoting *Carlson v. Warren*, 878 N.E.2d 844, 851 (Ind. Ct. App. 2007)). Hughes argued that he had a fiduciary *or* confidential relationship with McKibben. The trial court determined that McKibben and Hughes did not have a fiduciary relationship, which is equivalent to a confidential relationship by operation of law, but did not address whether they had a confidential relationship in fact.

Confidential relationships as a matter of law include fiduciary relationships such as "attorney and client, guardian and ward, principal and agent, pastor and parishioner . . . [and] parent and child," although this list is not exhaustive. *Id.* at 223 (quoting *Carlson*, 878 N.E.2d at 851). In the alternative, a confidential relationship in fact may arise where the facts of a given case "show a relation of trust and confidence justifying one in relying thereon," even where there is no legal presumption of such trust. *Id.* at 223-24 (quoting *Carlson*, 878 N.E.2d at 852). This Court has recognized that, while a "'relationship of trust and confidence' on the particular facts of the case has not been succinctly defined," it exists "'when confidence is reposed by one party in another with resulting superiority and influence exercised by the other.'" *Id.* at 225 (quoting *Kalwitz*, 822 N.E.2d at 281).

---

[6] Thus, a fiduciary relationship is a subcategory of relationships that are considered confidential. Fiduciary relationships are those that are presumed confidential as a matter of law. *See id.*

11

We agree with the trial court that McKibben did not owe Hughes a duty based on a confidential relationship as a matter of law—a fiduciary duty—because we have previously held that "[u]nmarried domestic partners are not among the relationships of trust and confidence recognized as a matter of law." *Id.* Nevertheless, there are sufficient, uncontested, facts that establish that McKibben and Hughes had a "relation of confidence and trust justifying [Hughes] in relying thereon" based on the facts of this specific case. *See id.* at 223 (quoting *Carlson*, 878 N.E.2d at 852).

We have previously found that a confidential relationship in fact may arise when one party fulfills a caretaking role for the other party. For instance, an adult child may owe his or her parent a duty based on a confidential relationship in fact when he or she has become the parent's caretaker. In *Meyer v. Wright*, 854 N.E.2d 57, 60 (Ind. Ct. App. 2006), *trans. denied*, the trial court found that there was a confidential relationship in fact where an adult child had taken over duties at the family farm, visited his father at the nursing home daily, took his father to dinner frequently, and transported his father to his attorney's office when needed. In contrast, in *Barkwill v. Cornelia H. Barkwill Revocable Trust*, 902 N.E.2d 836, 840 (Ind. Ct. App. 2009), *trans. denied*, the trial court found that a son had not assumed a dominant role of caretaker to his mother where she lived in her own home, maintained her independence, remained "crystal clear" in expressing herself, and had income and means of spending independent of her son. The difference between these two cases demonstrates that a duty based on a confidential duty may arise when one party is acting as a caretaker, but only if the facts "show a relation of

12

trust and confidence justifying [the person being cared for] in relying thereon." *Callaway*, 932 N.E.2d at 223-24 (quoting *Carlson*, 878 N.E.2d at 852).[7]

While Hughes and McKibben are not in a parent-child relationship, as in the cases above, the circumstances are analogous. Hughes, likewise, demonstrated that he was dependent on McKibben for much of his care and had a relationship of trust with her that justified his reliance on her. He testified that McKibben drove him everywhere, including to his doctor and psychiatric appointments; cooked for him; cleaned for him; helped him resolve issues with his student loans and taxes; filled out and submitted paperwork for him to receive Social Security benefits; opened a joint bank account with him; paid their bills; and helped him resolve legal issues. It is clear that Hughes relied on McKibben and trusted her to handle his affairs in good faith, to the point that McKibben had a resulting "superiority and influence" in their relationship. *See id.* at 225. Accordingly, we conclude that McKibben had a duty towards Hughes by virtue of their confidential relationship in fact. However, although we agree with Hughes that McKibben owed him a duty, he has not proven the second element of constructive fraud—that McKibben made a representation or omission in violation of that duty.

B. *Misrepresentation or Omission*

---

[7] Notably, the *Barkwill* Court clarified that, while a parent-child relationship normally "raise[s] a presumption of trust and confidence as to the subordinate party and a corresponding influence as to the dominant party," the presumption applies only when the parent assumes the dominant role. *Barkwill*, 902 N.E.2d at 839. The question of whether the child has assumed a dominant rule and has the corresponding influence is "a question for the trier of fact." *Id.* at 840. In other words, there is a presumption by operation of law that a parent owes a duty to his or her child based on the nature of their confidential relationship. However, a child may only owe his or her parent a duty based on a confidential relationship if the trier of fact determines that, based on the facts, the child has become the dominant party in the relationship.

13

In order to prove constructive fraud, Hughes was required to prove that McKibben made a representation or omission in violation of her duty towards him. *Mullen*, 643 N.E.2d at 401. He claims that McKibben told him that Medicaid would take away his house if he did not deed it to her. Similarly, Rosselot testified that he remembered that Hughes' reason for conveying the Property was "Medicaid planning." (Tr. 117). However, McKibben denied making any representations to Hughes about Medicaid taking away his house and claimed that she had never talked to him about Medicaid at all. She stated that she thought Hughes' reason for conveying the Property was to keep his family from getting it.

While there is a conflict in the evidence, we may not reweigh evidence on appeal. *Foster*, 647 N.E.2d at 1148. Through its denial, the trial court implicitly indicated that it found McKibben's testimony credible, and we will not re-evaluate her credibility on appeal. Accordingly, we conclude that McKibben did not make any representations to Hughes in violation of her duty towards him; nor is there any evidence that McKibben violated her duty through omission. Because Hughes did not satisfy this element, the conveyance of the Property was not constructively fraudulent.

2. Unjust Enrichment

Alternatively, Hughes argues that he is entitled to have the deed set aside under the theory of unjust enrichment in a cohabitation relationship. In support of this argument, he cites to our precedent that "a party who cohabits with another person without subsequent marriage is entitled to relief upon a showing of an express contract or a viable equitable theory such as an implied contract or unjust enrichment." *Turner v.*

14

*Freed*, 792 N.E.2d 947, 950 (Ind. Ct. App. 2003). However, Hughes did not raise this argument before the trial court, and, as a result, his argument is waived. *Breneman v. Slusher*, 768 N.E.2d 451, 463 (Ind. Ct. App. 2002) ("An appellant who presents an issue for the first time on appeal [] waives the issue for purposes of an appellate review."), *reh'g denied*, *trans. denied*.

3. Competence

Finally, Hughes argues that he was not competent to convey the deed to McKibben due to his mental illness. He contends that, even though he did not raise this issue in his pleadings, it was tried by the express or implied consent of the parties and should be treated as if it were raised in the pleadings. The trial court did not make an express finding on Hughes' competence, but we will treat it as if it were tried by the implied consent of the parties because the parties discussed Hughes' mental state extensively at trial and submitted his mental health records as an exhibit.

In *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 227 (Ind. Ct. App. 2009), we discussed the standard for determining whether an adult is mentally competent to convey real estate. We noted that:

> Indiana law "allows competent adults the utmost liberty in entering into contracts that, when entered into freely and voluntarily, will be enforced by the courts." . . . The mental capacity required to enter into a contract "is whether the person was able to understand in a reasonable manner the nature and effect of his act" on the date of the agreement. Evaluating mental capacity to contract for the sale of real property is closely akin to evaluating the mental capacity necessary to make a will. "In will contests, evidence as to the testator's mental condition both prior and subsequent to the execution of the will is admissible." "[P]roof of unsoundness of mind of a permanent nature raises an inference that such condition continues until the contrary is shown. . . ."

15

*Id.* (internal citations omitted).

Here, there is conflicting evidence in the record concerning Hughes' competence. Hughes testified to his ongoing struggles with bipolar disorder and depression, and he received Social Security benefits for affective disorder. He also claimed that the prescription drug he took, Abilify, "did all kinds of things" to him, to the point that he "was confused, had poor judgment, [and was] suicidal," among other symptoms. (Tr. 64). However, Tiffany Rosselot, Rosselot's assistant, testified that Hughes "appear[ed] to understand" why he was in Rosselot's office when he came in to convey the deed. (Tr. 100). Rosselot also testified that he "[a]bsolute[ly]" did not have concerns that Hughes did not understand what he was signing. (Tr. 112). He said that if he "had had concerns that [Hughes] didn't know what he was doing, [he] wouldn't have prepared [the deed]." (Tr. 112).

Hughes argues that we should not credit Rosselot's testimony as it was unprofessional of him to execute a deed conveying Hughes' property to McKibben when he had a long-standing friendship with McKibben. However, this relates to Rosselot's credibility, which we may not reconsider on appeal. *Foster*, 647 N.E.2d at 1148. Instead, we are faced with conflicting evidence, which we may not reweigh. *Id.* Accordingly, we must conclude that the trial court did not clearly err in determining that Hughes was competent to convey the Property.

16

APPEAL

On appeal, McKibben challenges the trial court's judgment against her in the amount of $14,879.55, consisting of $6,679.55 in checks she withdrew from Hughes' account and $8,200 of his other funds that she used. With respect to the trial court's order to repay the checks she wrote from Hughes' checking account, she argues that those checks satisfied Hughes' obligations towards the Property, which he was required to pay as a tenant since he stored his belongings there. She claims that she was entitled to receive the rent checks because she was his landlord. With respect to the $8,200 she paid for repairs to the Residence, she argues that the evidence did not support the trial court's conclusion that she used Hughes' money to pay for the repairs because there is no evidence that she withdrew the money from his bank account.

As stated above, the trial court's findings are clearly erroneous if they are not supported by substantial evidence of probative value. *Id.* In determining whether the findings and judgment are clearly erroneous, we will neither weigh the evidence nor judge witness credibility. *Id.*

McKibben's argument concerning the $6,679.55 in checks depends on her having a landlord-tenant relationship with Hughes, pursuant to which he would be liable for rent and the costs of maintaining the Property. However, there is no evidence of a written or oral lease in the record creating a landlord-tenant relationship. In addition, McKibben fails to cite any legal authority supporting her argument. As a result, we find that her argument is waived, and she is liable for the checks for rent, insurance, and utilities for the Property that she wrote from Hughes' account as the Property belonged to her.

17

*Dickes v. Felger,* 981 N.E.2d 559, 562 (Ind. Ct. App. 2012) ("A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."). Because we have found that she actually wrote $5,600 rather than $4,800 in rent checks, though, we reverse the trial court's judgment and remand with instructions for the trial court to re-enter the judgment against her accordingly.

Turning to McKibben's second argument, we note that there was conflicting evidence regarding the source of the money for the repairs to the Residence. McKibben claims that she could not have used Hughes' funds to pay for the repairs because there was no evidence that she withdrew the money from his account. Instead, she argues that her testimony that she paid for the repairs with money from the sale of a truck was unrefuted. However, Hughes testified at trial that McKibben used the $17,800 of his cash that he gave her for safekeeping to pay for the repairs and for a truck. Because there is a conflict in the evidence, we do not agree with McKibben's that her testimony was unrefuted. As we will not reweigh the evidence or judge witness credibility, we thus conclude that the trial court did not clearly err in determining that McKibben used Hughes' funds to pay for the repairs to the Residence. As a result, we affirm the trial court's judgment against her in the amount of $8,200 for the repairs.

In sum, we remand to the trial court with instructions to re-enter judgment against McKibben for $15,679.55, the total amount of the checks McKibben withdrew from Hughes' account to pay for the Property's bills and the money belonging to him that she spent on the Residence's repairs. Otherwise, we affirm the trial court's decision.

18

Affirmed in part, reversed in part, and remanded with instructions.

FRIEDLANDER, J., and MATHIAS, J., concur.