## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 18 2015, 9:30 am
CLERK
of the supreme court,
court of appeals and
tax court

---

**ATTORNEY FOR APPELLANT**

Patrick A. Duff
Duff Law, LLC
Evansville, Indiana

**ATTORNEY FOR APPELLEE**

Kevin R. Patmore
Patmore Law Office
Santa Claus, Indiana

---

IN THE
# COURT OF APPEALS OF INDIANA

---

Warren David Berglund,

*Appellant*,

v.

Victoria L. Schutzius,

*Appellee*.

August 18, 2015

Court of Appeals Case No. 74A01-1409-PL-388

Appeal from the Spencer Circuit Court

The Honorable Jon A. Dartt, Judge

Cause No. 74C01-1009-PL-539

**Brown, Judge.**

Warren David Berglund appeals the trial court's order that he become the sole owner of certain real estate subject to a lien in favor of Victoria L. Schutzius and denying his counterclaims for breach of fiduciary duty, conversion, and unjust enrichment. Berglund raises two issues which we revise and restate as:

I.    Whether the trial court erred when it ordered that Berglund become the sole owner of certain real estate subject to a lien in favor of Schutzius; and

II.   Whether the trial court erred in denying his counterclaim.

We affirm.

### Facts and Procedural History

Berglund and Schutzius met in 1976 or 1977 in Atlanta, Georgia. At some point, Berglund received a degree in economics and graduated from chiropractic college. In 1994, Berglund set up a chiropractic practice in Virginia Beach, Virginia. In 1996, Schutzius began working for Berglund as an office manager in his chiropractic office.

At some point, Berglund and Schutzius purchased a house on Ebb Tide Road in Virginia and a lot in the City of Nags Head, North Carolina. Berglund purchased a house on Elizabeth Street in Kill Devil Hills, and Schutzius's name was added to the deed for that house. At some point, Berglund and Schutzius sold the house in Virginia Beach and each had a gain of $113,500, for a total profit of $227,000. Berglund and Schutzius also sold the house in Kill Devil Hills on a "1031 real estate exchange" for a total gain of $123,984. Transcript at 33.

In 2004, Berglund suffered a cervical spine injury. Berglund was taped up every day "with an ace bandage from [his] chest down to try to be able to take care of things," but eventually Berglund had "hard trouble using [his] left arm and left leg . . . ." *Id.* at 26. Due to health issues, he gave up his chiropractic practice.

In December 2004, Berglund gave Schutzius power of attorney over his affairs when he "started not to be able to do anything." *Id.* at 27. The power of attorney granted Schutzius the right to "sell, convey, mortgage, hypothecate, pledge, quitclaim, or otherwise encumber or dispose of any part or parts of [Berglund's] property, real or personal, or any interest which [he] may have therein, upon such terms as [she] may think proper." Defendant's Exhibit 1. The power of attorney also stated:

> GIVING AND GRANTING unto my said attorney full power and authority to do and perform all and every act, deed, matter, and thing whatsoever in and about my estate, property and affairs, as fully and effectually to all intents and purposes as I might or could do in my own proper person if personally present, the above specially enumerated powers being in aid and exemplication [sic] of the full, complete and general power herein granted and not in limitation or definition thereof; and hereby ratifying all that my said attorney shall lawfully do or cause to be done by virtue of these presents . . . .

*Id.* After Berglund's signature, the power of attorney indicates that it was signed in Virginia and the notary public stamp indicates it was notarized in the Commonwealth of Virginia.

Schutzius became Berglund's cook, nurse, housekeeper, and financial record keeper, and she took care of all of his affairs including purchasing groceries. In

approximately 2006, Berglund and Schutzius moved to southern Indiana. Schutzius transported Berglund to Louisville and Indianapolis to different doctor appointments. In 2006, Berglund and Schutzius purchased property at Hevron Drive in Santa Claus, Indiana (the "Hevron Property") with a "real estate like-kind exchange." *Id.* at 53. Berglund and Schutzius intended to use the Hevron Property as a rental property and that Schutzius's daughter, Rachel Atchison, and Rachel's husband, Dale Atchison, would rent the property. On November 30, 2007, in a document titled "QUITCLAIM DEED," Schutzius and Berglund by Schutzius, his "attorney in fact," released and quitclaimed the Hevron Property for "the sum of One Dollar ($1.00) and other good and valuable consideration" to themselves and the Atchisons. Defendant's Exhibit 7. On June 27, 2008, in a document titled "DEED," Schutzius, the Atchisons, and Berglund by Schutzius, "his attorney in fact," conveyed the Hevron Property to the Atchisons for "the sum of One Dollar ($1.00) and other valuable consideration paid . . . ." Defendant's Exhibit 8.

[7]     In 2008, Berglund told Schutzius that she could buy the Atchinsons a vehicle. Schutzius purchased a Honda CR-V and drove Berglund to doctor's appointments, errands and trips, and also used the vehicle to go to work to support Berglund.

[8]     In 2009, Schutzius and Berglund purchased property at 801 West Melchoir Drive (the "Melchoir Property") in Santa Claus, Indiana. They owned the property jointly with rights of survivorship and obtained a mortgage through

Navy Federal Credit Union. Berglund and Schutzius collectively put down $15,000, and Berglund's mother contributed some money.

In 2010, Schutzius transferred the Nags Head property back to Berglund. She moved out of the house on Melchoir Drive in November 2010. At some point after Berglund and Schutzius separated, Schutzius told Berglund that he could have the house at Melchoir Drive.[1]

On September 14, 2010, Schutzius filed a complaint against Berglund and Navy Federal Credit Union. Schutzius alleged that she and Berglund were the owners, as joint tenants with rights of survivorship, of the Melchoir Property, that the Melchoir Property required partition pursuant to Ind. Code § 32-17-4-1, and that Berglund's control of and refusal to return her property constituted the execution of unauthorized control over her property.

On December 7, 2010, Berglund filed a response and alleged counterclaims including breach of fiduciary duty, conversion, and unjust enrichment.

On July 7, 2014, the court held a trial. When asked why he gave Schutzius power of attorney in 2004, Berglund answered:

> You know I – like I said I just – just got to the point where it was just a struggle to be alive and you know my concerns at that point were you know trying to keep my head you know together and you know I say that like going to you know the bathroom or trying to take a shower or bath were like horrifying for me because I was so sick. I was in

---

[1] At trial, Schutzius testified that she wanted the house sold and the proceeds divided.

constant tremendous pain so I just couldn't perform. I couldn't do anything really and you know I thought that would – you know I didn't really know what to do and [Schutzius] said that she would help me out so.

Transcript at 29. When asked to explain his physical, mental, and psychological condition when he was disabled, Berglund stated:

> [A]fter like at the end of 2004, I just got you know getting worse and worse where I could hardly walk and I actually had to be pushed around in a wheelchair for awhile. . . . I believe that the steroid drugs possibly knocked out my adrenal glands so I could not take in water. It was terrible. I mean I couldn't absorb any water. I was in the hospital many times getting I-Vs to get me kind of bring me back to live for awhile. But it – it was bad. It was a very bad situation.

*Id.* at 46. Berglund testified that he did not agree to the transfer of the Hevron Property, and that he was asking for damages of $31,496 for social security benefits he received because a part of it was spent to buy a Honda in 2008. He acknowledged that Schutzius drove him to doctor's appointments, bought groceries, took him on errands and trips, and used the vehicle to go to work to support him. He testified that he told her that she could buy "us" a vehicle. *Id.* at 75. Berglund also testified that he was requesting the return of the $113,500 which he received in gain from the sale of the Virginia residence, which was used by Schutzius to buy property that he no longer owns. He stated his assumption that Schutzius used the money to buy the Hevron Property, purchase a car for her daughter, and buy various kitchen appliances.

[13] Schutzius testified that the Atchisons were placed on the deed for the Hevron Property "[i]n case something happened to us it would go to them without a bunch of rigmarole." *Id.* at 110. She stated that her granddaughters referred to Berglund as "PopPop." *Id.* at 116. She testified that the Hevron Property was placed strictly in the Atchisons' names because Berglund was "insistent that he was you know he was dying and he wanted them taken care. He didn't want them to have any worries. He wanted to have them and the girls a place to live and he didn't want his family to get a hold of anything that was his." *Id.* at 111-112. She also testified that she signed the deed because Berglund would never show up to sign anything. When asked why Berglund did not sign the deed transferring the property to the Atchisons, Schutzius answered: "You tell me. You deal with him. He wouldn't get out of the house to do anything. I mean I don't know what to tell ya. He was too busy dying." *Id.* at 114.

[14] Schutzius introduced, and the court admitted, her journal, kept for years 2004 to 2009. She testified that she and Berglund talked about acquiring a more comfortable vehicle, that he told her to buy another vehicle, that she paid medical bills for him, and that he had no income other than $2,000 a month. She also testified that he probably had over $250,000 in medical bills over eight or nine years.

[15] Schutzius stated that a rehab center in Utah indicated that Berglund was faking his illness and that she witnessed Berglund "crawl across the floor one minute and get up and go make popcorn the next." *Id.* at 138. She also testified that the relationship fell apart because Berglund became meaner, knocked her

around, and she "had put in almost seven (7) years working with him and trying to get him better and it just – I was done. There's only so much a person can take." *Id.*

[16] On August 11, 2014, the court entered an order that Berglund be the sole owner of the Melchoir Property subject to a lien of $7,500 in favor of Schutzius and denying Berglund's counterclaims. Specifically, the court's order states:

1. This is not a case where partition for real estate is appropriate as much of the down payment for the joint property was made by a third party ([Berglund's] mother) and [Schutzius] only resided with [Berglund] in the joint real estate for about the first one and one-half (1 ½) years after purchase and [Berglund] has lived in the real estate alone and paid all mortgage payments, taxes, maintenance, and insurance for the last three (3) years and nine (9) months. Under the circumstances, it would be inappropriate for [Schutzius] to receive one-half (1/2) of the equity as requested and would cause [Berglund] who is ill and on limited income to have to move from the residence.

2. Instead, the Court chooses to treat this case similar to a dissolution action even though the parties in this case have never married but lived together in a long term relationship for years. [Schutzius's] Count 1 requested Partition and "all other relief just and proper in the premises". Instead of partition, the Court finds [Schutzius] is entitled to the return of her portion of the down payment which she testified she believe [sic] totaled $15,000.00 from both parties, or $7,500.00 as her portion. This manner of distribution is consistent with how the parties treated and/or divided other real estate and/or investments and keeps the parties from having to expend additional fees for appraisers, realtors, and attorneys.

3. [Berglund] shall be the sole owner and possess the real estate at 801 W. Melchoir Drive, Santa Claus, Indiana 47579 in Spencer County, State of Indiana subject to a lien in the amount of $7,500.00 to [Schutzius].

4. [Schutzius] shall have a judgment against [Berglund] in the amount of $7,500.00. [Berglund] shall satisfy said judgment by paying regular monthly payments to [Schutzius]. [Berglund] shall pay said judgment in full within two (2) years of the date of this Order or the

real estate shall be listed with a realtor and sold at fair market value to pay off said judgment lien. This Order allows [Schutzius] to recover her interests in the real estate and allows [Berglund] to remain there and be the owner of the increase in equity as he continues to pay down the mortgage.

5.  [Schutzius] shall also be entitled to her court costs of $159.00 and post-judgment interest.

6.  [Berglund's] Counterclaim is denied in full as there was insufficient evidence to support [Berglund's] claims. [Schutzius] had a valid power of attorney from [Berglund] to act for him financially and the Court did not find sufficient evidence that she exceeded her authority, committed self-dealing, or misappropriated his assets. [Schutzius] was juggling a difficult financial situation with [Berglund] who was in poor health and expenses such as medical expenses exceeded the parties' incomes. She received his input on most decisions and he has Economics degree(s) from college. A major asset in dispute was a certain piece of real estate known as the Hevron Road property which ultimately ended up being transferred to [Schutzius's] daughter and son-in-law. The evidence shows that said property was purchased almost entirely from [Schutzius's] monies and not [Berglund's] monies and that any of [Berglund's] interest in said property was intended to be a gift to [Schutzius's] daughter and son-in-law who also had helped [Berglund] during his illness several times such as with transportation. Once a gift is made it cannot be rescinded later absent a legal justification which has not been proven in this case.

7.  The Court finds [Berglund] takes nothing by way of this Counterclaim.

8.  [Schutzius] shall further possess and be the owner of the Chicago Bulls poster and a certain piece of antique furniture (a dresser) she had before she moved into 801 W. Melchoir.

9.  [Berglund] shall further possess and be the owner of the dishes in the attic (Aunt Dot), the Clinical Kinesiology manuals, and all garage door openers for 801 W. Melchoir.

10. Otherwise, the parties shall possess and be the owners of all property in their individual possessions as previously divided.

Appellant's Appendix at 29-31.

[17]    On August 19, 2014, Schutzius filed a motion for relief from judgment requesting that the court amend its judgment to provide a time during which Berglund shall refinance or otherwise cause the release of Schutzius from the mortgage debt.   On August 20, 2014, the court entered an amended order clarifying its prior order as follows:

> The Court's intention in its August 11, 2014 Judgment is that [Berglund] shall continue to possess, pay for, and hold harmless and indemnify [Schutzius] on the joint debt secured by the 801 W. Melchoir Drive property owed to Navy Federal Credit Union. [Berglund] shall make all reasonable efforts to refinance or otherwise cause the release of [Schutzius] from the mortgage debt within ninety (90) days of the date of the Judgment and continuing thereafter.  The Court was unsure if [Berglund's] financial condition allowed him to refinance into his name alone immediately which is why the Court ordered the two year frame from the judgment by which time the property must either be refinanced or [Schutzius] be released from the debt in order to avoid sale of the real estate.  In all other respects, the Court's prior Order remains in full force and effect.

*Id.* at 34.

## *Discussion*

[18]    Where, as here, the trial court has entered findings of fact and conclusions thereon *sua sponte*, the findings only control as to the issues they cover. *McKibben v. Hughes*, 23 N.E.3d 819, 825 (Ind. Ct. App. 2014), *reh'g denied*, *trans. denied*.  We will not set aside its findings and conclusions unless they are clearly erroneous.  *Id.*  On appeal from an adverse judgment, the findings are clearly erroneous if they are not supported by substantial evidence of probative value.

*Id.* In determining whether the findings and judgment are clearly erroneous, we will neither weigh the evidence nor judge witness credibility. *Id.*

I.

The first issue is whether the trial court erred when it ordered that Berglund become the sole owner of the Melchoir Property subject to a lien in favor of Schutzius. Berglund argues that the trial court erred when it ordered him to pay $7,500 to Schutzius as a repayment for her contribution of a down payment for that property. He contends that any contribution by Schutzius to the Melchoir Property should be treated as a gift, and that Schutzius told him that he could have the home. He states that Schutzius acknowledged during her testimony that he contributed $20,000 toward the purchase of the Hevron Property for which she was never ordered to reimburse him, and that his contribution to the relationship was substantial.

Schutzius states that "[a]s [she] simply desires that the relationship be terminated as expeditiously as possible, she did not cross-appeal the Trial Court's Judgment on this matter." Appellee's Brief at 6. She requests that to the extent this court finds error and reverses the trial court's resolution regarding the Melchoir Drive home, we should remand with instruction to sell that home according to the partition statutes.

We note that while Berglund cites authority in the standard of review section of his brief, he does not cite any authority or the record in the discussion section of his argument. We remind Berglund that Ind. Appellate Rule 46(A)(8)(a)

provides that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22."

The record reveals that Schutzius testified that Berglund probably had over $250,000 in medical bills over eight or nine years, that she paid those medical bills, and that a single tax return for 2006, the only tax return admitted at the hearing, indicates medical and dental expenses of $46,525. Schutzius became Berglund's cook, nurse, housekeeper, and financial record keeper, and she took care of all of his affairs including purchasing groceries. She transported him to Louisville and Indianapolis for doctor appointments. Schutzius testified that she and Berglund put down about $15,000 as a down payment for the Melchoir Property. Based upon the record, we cannot say that the trial court erred in ordering that Berglund become the sole owner of the Melchoir Property subject to a lien of $7,500 in favor of Schutzius.

II.

The next issue is whether the trial court erred in denying Berglund's counterclaim. Berglund argues that the court erred when it denied his claims for breach of fiduciary duties, conversion, and unjust enrichment. We will address each separately.

A. *Breach of Fiduciary Duties*

[24] Berglund argues that Schutzius breached her fiduciary duty to him because she used her power of attorney to disburse his assets through self-dealings that were not at arm's length. Without citation to the record, he asserts that Schutzius purchased a new Honda CR-V for $29,000 with his money, titled it in her name, and never returned the vehicle after the power of attorney was terminated. He also asserts that Schutzius did not properly manage the Hevron Property and improperly transferred the Hevron Property to her daughter and son-in-law.

[25] Schutzius argues that the conveyance of the Hevron Property was not self-dealing because she did not receive any benefit from the transfer. She also contends that Berglund specifically testified that he instructed her to purchase a vehicle and that it is irrelevant whose name the vehicle was titled in because it was later sold in the course of the relationship. In his reply brief, Berglund contends that it is ludicrous to think that Schutzius would not benefit from her daughter and son-in-law having a piece of property gifted to them. He also points out that the Hevron Property was acquired through an exchange with the undisputed purpose of being a rental property.

[26] At the time of the transfer of the Hevron Property, Ind. Code § 30-5-3-2 provided that "[a] power of attorney is valid if the power of attorney was valid at the time the power of attorney was executed under . . . [t]he law of another

state or foreign country."[2]  The power of attorney was executed in Virginia, and Berglund does not argue that it was not executed under Virginia law.  In 2009, the legislature enacted Ind. Code § 30-5-3-6, which provides:

> The meaning and effect of a power of attorney are determined by the law of the jurisdiction indicated in the power of attorney.  In the absence of an indication of jurisdiction, the meaning and effect of a power of attorney are determined by the law of the jurisdiction in which the power of attorney was executed.

Berglund cites Indiana law and makes no argument that the law of Virginia should apply and does not direct us to relevant Virginia law to suggest that Schutzius lacked the authority under the power of attorney to transfer the Hevron Property.  Indeed, Berglund does not argue that the language in the power of attorney or its meaning and effect precluded Schutzius from taking certain actions including transferring the Hevron Property.  Rather, he focuses on whether Schutzius breached her fiduciary duties.

[27]  To the extent Berglund argues that Schutzius breached her fiduciary duties as an attorney in fact under Indiana law, we will address his argument.  Ind. Code § 30-5-6-2 provides that "[e]xcept as otherwise stated in the power of attorney, the attorney in fact shall use due care to act for the benefit of the principal under the terms of the power of attorney."  Ind. Code § 30-5-6-3 provides that "[a]n attorney in fact shall exercise all powers granted under the power of attorney in

---

[2] Subsequently amended by Pub. L. No. 143-2009, § 24 (eff. July 1, 2009).

a fiduciary capacity." *See also In re Estate of Rickert*, 934 N.E.2d 726, 730 (Ind. 2010) ("A person holding a power of attorney is in a fiduciary relationship to the person granting the power."). "A holder of a power of attorney is a fiduciary and therefore any transaction in which the holder uses a power of attorney to transfer assets to the holder is presumed invalid." *Id.* at 727.

[28] At common law, a transaction in which a party uses her position as attorney-in-fact in a self-dealing manner is presumed to be invalid. *Id.* at 730. This presumption has statutory support. *Id.* Ind. Code § 30-5-9-2 is titled "Attorney in fact benefiting from act; individual or conflicting interests" and provides:

> (a) An attorney in fact who acts with due care for the benefit of the principal is not liable or limited only because the attorney in fact:
>
>> (1) also benefits from the act;
>>
>> (2) has individual or conflicting interests in relation to the property, care, or affairs of the principal; or
>>
>> (3) acts in a different manner with respect to the principal's and the attorney in fact's individual interests.
>
> (b) A gift, bequest, transfer, or transaction is not presumed to be valid or invalid if the gift, bequest, transfer, or transaction:
>
>> (1) is:
>>
>>> (A) made by the principal taking action; and
>>>
>>> (B) not made by an attorney in fact acting for the principal under a power of attorney; and
>>
>> (2) benefits the principal's attorney in fact.

In other words, Ind. Code § 30-5-9-2(b) "eliminates the presumption of invalidity of a 'gift, bequest, transfer, or transaction' between the principal and the attorney-in-fact only if it is 'made by the principal' and 'not made by an

attorney-in-fact acting for the principal under a power of attorney.'" 934 N.E.2d at 730. "If undue influence is presumed, the burden 'then shifts to the dominant party to demonstrate, by clear and unequivocal proof, that the transaction was voluntary and fair.'" *Id.* at 730 (quoting 4 HENRY'S INDIANA PROBATE LAW AND PRACTICE § 30.18 at 155 (2009)).

[29] Even assuming that Schutzius's act of signing the deed transferring the Hevron Property as Berglund's attorney in fact constituted an act of self-dealing, we conclude that she met her burden of demonstrating that the transaction was voluntary and fair. Schutzius testified that the deed was placed in her daughter and son-in-law's names because Berglund

> was insistent that he was you know he was dying and he wanted them taken care. He didn't want them to have any worries. He wanted to have them and the girls a place to live and he didn't want his family to get a hold of anything that was his. So that's why we did it.

Transcript at 111-112. The following exchange also occurred during the cross-examination of Schutzius:

> Q       Ma'am I guess what the particular is here if this is $195,000.00 house – so you're saying that Mr. Berglund with his health issues and his inability to earn money he made a gift of – of that much money to someone not related to him?
>
> A       Uh huh. (Affirmative Response).

*Id.* at 114-115. Moreover, we note that Schutzius's journal, which clearly contains self-serving declarations, was admitted into evidence without objection, and an entry in the journal dated September 29, 2007 states:

[Berglund] wants me to promise to go on without him, to take care of the dogs, to take care of Rachel and the girls, to be happy, to move on, to have a good life. I asked him why he believes he's dying and all he says is that he can feel his body giving out on him and he doesn't think it's going to be able to hold up much longer. He wanted me to promise him that Rachel and the girls live a long and happy life in their new home, and he wishes PopPop was going to be around to see them all grow up.

Plaintiff's Exhibit A at 21. The trial court heard both Berglund and Schutzius testify and was able to review the journal, and we cannot reweigh the evidence. Based upon the record, we cannot say that the trial court erred in determining that the transfer of the Hevron Property was not a breach of Schutzius's fiduciary duty. *See Am. Savings, FSB v. Tokarski*, 959 N.E.2d 909, 916 (Ind. Ct. App. 2011) (holding that, if an act by a holder of a power of attorney of depositing cashier checks into his own account was presumptively invalid, the deposition and affidavit of the holder of the power of attorney indicating that the grantor of the power of attorney intended him to have the money constituted sufficient evidence to rebut the presumption of invalidity), *reh'g denied*, *trans. denied*.

[30] To the extent Berglund argues that Schutzius breached her fiduciary duties with respect to the vehicle, the record reveals that Schutzius and Berglund talked about acquiring a more comfortable vehicle, that Berglund told her to buy another vehicle, and that she drove Berglund to doctor appointments, took him on errands, and used the vehicle to go to work to support him. With respect to his argument that Schutzius had access to funds totaling $206,988 and that he

had nothing when the power of attorney was terminated, we observe that Schutzius testified that Berglund probably had over $250,000 in medical bills over eight or nine years and that she paid them, and a tax return for 2006 alone indicates medical and dental expenses of $46,525. We cannot say that the trial court erred in determining that Schutzius did not breach her fiduciary duties.

B. *Conversion*

[31] Ind. Code § 35-43-4-3 provides that a person commits criminal conversion when he or she knowingly or intentionally exerts unauthorized control over the property of another person. Pursuant to Ind. Code § 34-24-3-1, a person who suffers a pecuniary loss as a result of a violation of Ind. Code § 35-43-4-3 may bring a civil action against the person who caused the loss. A criminal conviction for conversion is not a condition precedent to recovery in a civil action for conversion. *Breining v. Harkness*, 872 N.E.2d 155, 159 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*. Rather, a claimant must merely prove commission of the crime by a preponderance of the evidence. *Id.*; *see also French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008).

[32] Without citation to the record, Berglund asserts that Schutzius used his resources in the amount of $206,998 to acquire various assets and make purchases, and refers to the Honda CR-V and a Scottrade account that he had at one point. He does not discuss his medical expenses. With respect to the Honda CR-V, Schutzius testified that she and Berglund talked about acquiring a

more comfortable vehicle, that Berglund told her to buy another vehicle, and that she drove Berglund to doctor appointments. Under the circumstances, we cannot say that the trial court erred in denying Berglund's claim of conversion. *See Breining*, 872 N.E.2d at 159 (finding that the evidence was insufficient to prove that the appellant's stepbrother had exercised unauthorized control over the money of the appellant's mother).

C. *Unjust Enrichment*

[33] Berglund contends that based upon Schutzius's spending of his funds to purchase a vehicle, the Hevron Property, and "various unknown items, it would be a great manifest of injustice to allow [Schutzius] to benefit from all of these things." Appellant's Brief at 17. Schutzius posits that Berglund's claim rests upon the assumption that none of his share of the funds was spent on his medical or other living expenses but was invested entirely in the Hevron Property.

[34] "A claim for unjust enrichment 'is a legal fiction invented by the common law courts in order to permit a recovery . . . where the circumstances are such that under the law of natural and immutable justice there should be a recovery . . . .'" *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) (quoting *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991)), *reh'g denied*, *cert. denied*, 502 U.S. 1094, 112 S. Ct. 1170 (1992). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id.* (quoting RESTATEMENT OF RESTITUTION § 1 (1937)). "To prevail on a

claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Id.* Principles of equity prohibit unjust enrichment of a party who accepts the unrequested benefits another person provides despite having the opportunity to decline those benefits. *Turner v. Freed*, 792 N.E.2d 947, 950 (Ind. Ct. App. 2003). "One who labors without an expectation of payment cannot recover in quasi-contract." *Sonnenburg*, 573 N.E.2d at 408. *See also* 9 ARTHUR, INDIANA PRACTICE § 17.21 (2010) ("A benefit gratuitously conferred upon the other party is not unjust enrichment."). A party who cohabitates with another person without subsequent marriage is entitled to relief upon a showing of an express contract or a viable equitable theory such as an implied contract or unjust enrichment. *Turner*, 792 N.E.2d at 950 (citing *Bright v. Kuehl*, 650 N.E.2d 311, 315 (Ind. Ct. App. 1995), *reh'g denied*).

[35] In order to prevail on a claim for unjust enrichment, Berglund needed to show that a measurable benefit had been conferred on Schutzius under such circumstances that Schutzius's retention of the benefit without payment would be unjust. *See Bright*, 650 N.E.2d at 316. Based upon the record, we cannot say that Berglund met his burden. We therefore find no error in the trial court's denial of Berglund's claim of unjust enrichment.

## Conclusion

[36] For the foregoing reasons, we affirm the order of the trial court.

Crone, J., and Pyle, J., concur.